# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL INDICTMENT** |
| **v.** | ) | |
| | ) | **NO. 1:09-CR-414-JOF/AJB** |
| **MICHAEL ASHER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S
## FINAL REPORT AND RECOMMENDATION

Before the Court is Defendant Michael Asher's (hereinafter "Defendant" or "Asher") motion to suppress statements. [Doc. 19]. For the following reasons, the undersigned **RECOMMENDS** that the motion be **DENIED**.

### *Introduction*

Asher was indicted on September 23, 2009, by a Grand Jury in this District, which charged him with receiving child pornography, in violation of 18 U.S.C. § 2252(a)(2) and (b) (Count One), and possessing a computer containing child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). [Doc. 10]. Following his entry of a not guilty plea at arraignment, [Doc. 14], Asher filed, *inter alia*, a motion to suppress statements. [Doc. 19]. The Court held an evidentiary hearing on the motion on November 6, 2009, [Doc. 28; *see also* Doc. 29 (Transcript, hereinafter

"T__")].  The parties then filed briefs.  [Docs. 30 (Asher brief), 31 (Gov't response),
32 (Asher reply)].  With briefing completed, the motion is now ripe for a
recommendation as to its disposition.

### Facts

The Court finds the following facts from the evidentiary hearing.  At the time of
the hearing, FBI Special Agent Joan Cromier had been with the FBI for 13 years.[1]  In
February 2009, Cromier was assigned to the FBI's Innocent Images Squad, which
investigates crimes against children involving computers and the Internet.  T3-4.

Cromier received information from law enforcement officers in Maryland, who
related that they had been conducting an online investigation into a peer-to-peer file
sharing program where child pornographic images were downloaded from an IP
("Internet Protocol") address which was traced to Asher's residence.  After conducting
further investigation, Cromier obtained a federal search warrant that was executed at
Asher's residence in Conyers, Georgia, on February 19, 2009.  T4.

The search team consisted of eight law enforcement officers, including Cromier,
other non-FBI agent members of the FBI Innocent Images Squad, Lieutenant Michael

---

[1]      Cromier previously was an investigator with the State of Florida for
11 years.  T3.

2

Sellers (a uniformed Rockdale County Sheriff's Department officer), Rockdale County Sheriff's Department Detective Tracy Ratford, and two detectives from Henry County. T5, 21, 22, 51.[2]  The officers had arrived in four vehicles - the uniformed officer's marked truck and three others.  T24, 60.  Cromier's role as lead agent was to try and talk to Asher.  T5, 46.

The agents executed the warrant at 7:00 am.  T5.  Sellers initially stayed outside the residence while the warrant was executed.  T6, 25, 51.  The driveway to Asher's residence was 500-600 feet off the roadway, with woods on both sides of the driveway. Sellers parked his patrol vehicle, a Ford F-150 pickup, across the driveway where it made a right hand turn, in view of the front door to the residence, blocking the driveway.  T51, 70.

With five other officers by her side or behind her, Cromier knocked on the front door, and Asher answered it, wearing a robe over his pajamas.  T7, 26.  She introduced herself and advised him they were there to execute a search warrant.  T7.  Asher let them in and Cromier and the five officers entered the foyer.  T7.[3]  (Sellers and one or

_____

[2]        Three of the officers were female.  T21.

[3]        Asher contends that the officers simply entered the foyer through no action on his part.  [*See* Doc. 30 at 2; T26].  The Court credits Cromier's direct testimony that Asher let the officers into the residence.  T7.  The Court further recognizes that Asher

3

two other officers remained outside during the initial entry, for security and to see if anyone attempted to leave the residence. T26.) Although all the officers were armed with sidearms, no weapons were drawn. T7, 23.

Once inside the foyer, Cromier advised Asher that they were there with a search warrant involving computers. She further advised that no one was under arrest, and that they were going to get what they needed and leave. T7-8, 27. Cromier also told Asher that the agents needed to do a security sweep of the residence to insure no one else was present and then they could sit down and "really discuss the details. . . ." T8, 27.[4]

Asher asked to change his clothes and Cromier responded that he could, but she first asked if anyone else was in the home. T8. Asher's wife, Tatiana, soon appeared in the foyer, and Cromier asked about Asher's son, of whom she was aware. T8, 27-28.

---

had no choice but to let them in because the search warrant gave the officers lawful authority to enter, with or without Asher's assistance or acquiescence. *See Tokar v. Bowersox*, 198 F.3d 1039, 1048 n.10 (8th Cir. 1999) (concluding that the issue of consent was "irrelevant because the officers had a search warrant for the house"); *United States v. Jones*, 451 F. Supp. 2d 71, 87 (D.D.C. 2006) (finding that officers did not need to rely on consent to search where search was authorized by search warrant); *cf. United States v. Brown*, 243 Fed. Appx. 544, 548 (11th Cir. 2007) ("Voluntary consent is a well-established exception to the Fourth Amendment's probable cause and warrant requirements."). Still, the record does not support a finding that the officers simply barged into the foyer.

[4]     During the security sweep of the house, two long guns were discovered under the bed in the master bedroom. They were not taken from the residence. T47.

4

Asher responded that the son was on vacation, but that their 10-year old daughter was in the house. T8, 28. Cromier and Mrs. Asher discussed letting her sleep, but then it was decided it would be best to wake her. T8-9. One of the officers escorted Mrs. Asher to wake her daughter. T28. Afterward, Mrs. Asher and the daughter were escorted to the main level and were seated in the living room. T28. Cameron Rowe, a Roswell detective on the FBI task force, remained in the living room with them and interviewed Mrs. Asher and the daughter. T31.[5]

Asher was allowed to change into clothes. T9, 29. The master bedroom was on the main floor. T9, 29. Cromier and Ratford escorted Asher to the bedroom. When it appeared to Cromier that Asher was proceeding too slowly and putting on shoes and a belt, she told him that they (meaning the officers and Asher) were not going anywhere, and that he was not under arrest. T9-10, 29-30. She told him that, "We are just going to talk in the living room or wherever." T10.

Neither Asher nor any other resident of the house was handcuffed during the search of the residence. T10. Although the Ashers were accompanied by officers when

---

[5]     Rowe questioned Mrs. Asher, who stated that she did not know of any inappropriate behavior between Asher and their daughter. T38-39.

5

they changed rooms, they otherwise were not forced to remain in any specific room in the residence. T56.

After Asher changed his clothes, the officers and Asher exited the bedroom and sat down at a table in the dining room. T10. He purposely was placed in a separate room from his wife and daughter, so the interview could be conducted away from the others. T31. Asher sat at the end of the long table, and Cromier sat on his right, while Ratford sat on the other side of Cromier. T11. While Asher was being questioned, other officers continued the search of the residence. T11.

Cromier was dressed in black jeans and a windbreaker-type jacket with "FBI" on the back. T11-12, 22. She may have had on a bullet-proof vest. T22. The other officers were dressed in khakis and ballistic vests, except for Sellers, who was in uniform. T12, 22. Sellers entered the house after about 10 to 15 minutes, and remained in the foyer area for about 45 minutes before entering the dining room. T52, 54. Every member of the search team was clearly identified as a law enforcement officer. T23.

In beginning the interview, Cromier addressed Asher in a conversational tone, telling him that they were there to execute the search warrant and not to arrest anyone. She told him that an agent in another division was on "Giga Tribe" and downloaded child pornography images that were traced to the IP address at his residence. T12, 32.

She also stated that they were going to take the computers pursuant to the search warrant. T12, 31. She asked him if she would find any child pornography on his computer, and he guaranteed that none would be found in the residence. He also denied that his son was involved. T32-33, 43.

Cromier asked Asher about computers in the house. He responded that he had computers that he used for work in his upstairs office, including a desktop, laptops, and a "couple of junkers." T33. He stated that the computer his wife used was in the master bedroom. Both the son and daughter had computers in their respective rooms. T33.

Cromier described Asher's answers as vague, very short and direct. He stated he worked as a computer programmer for AT&T, but that he worked from home. T33. He also stated that his computer ability was self-taught, he went to his office once in awhile, and described his work only as a project manager. T34.

Cromier also asked him about how he met his wife. T45. But, when Cromier further asked him about his family, Asher stated he did not want to answer personal questions. Cromier did not press the issue. T15.

Cromier initially spoke to Asher for approximately 30 minutes. T13. Between one to one and a half hours after the officers had arrived, Cromier approached

7

Mrs. Asher and asked if she needed to go to work or take the child to school. T13, 35. Mrs. Asher explained that she needed to take her daughter to school. T13. Mrs. Asher took the daughter to school[6] and returned home. T13.[7]

At some point, Cromier went upstairs to assist in the search. T13-14. Ratford remained in the dining room with Asher, while Sellers walked around in the foyer and dining room. T14, 63. At some point, Ratford had to leave to go to court and Sellers replaced him at the dining room table. T63.

Cromier then returned to the dining room and asked Asher about some pills found during the search. Asher responded that the pills were his Viagra and he got them on the Internet. Cromier then left the dining room to continue helping in the search. T14.

On one occasion when Cromier was not in the room, Asher told Sellers, who was standing inside the dining room, that he looked familiar. Sellers stated that he was involved in the local school system because his children were enrolled there. Asher

---

[6]     Sellers' vehicle was blocking the driveway and had to be moved to let Mrs. Asher leave. T53. Once she left, he kept his vehicle on the side of the driveway so that he would not have to move it again when Mrs. Asher returned. T53.

[7]     The two Henry County detectives, Kelly Bowles and Amanda McCourt, briefly interviewed the daughter in the master bedroom. T45-46.

8

asked him what he thought was going to happen. Sellers replied that he did not know but "[a]ll I can suggest to do is to tell the truth." T56. On another occasion, Asher asked to be able to go and get a drink, and Sellers escorted him into the kitchen to get a drink. T56. They then walked into the living room where Mrs. Asher was seated before returning to the dining room. T64.

Cromier then returned to the dining room to question Asher again. T15. This portion of the interview lasted about 15 minutes. T14. This time, the tone of the interview became more confrontational. T15. Cromier had located Asher's wallet while she was searching, and brought it to the dining room. She asked Asher if this was his wallet, and when he stated it was, she asked him to take out his driver's license, and he complied. Cromier noticed it was a Florida driver's license. T15. Then, as related by Cromier:

> And I commented, "Oh, you got a Florida driver's license." And it had an address on there, Walnut Creek or something like that. And I asked him, "Why the Florida driver's license? What is that address?" He said, "It is an address." "I know it is an address, but what significance is that." He says, "Well, that is an apartment where I used to live and I never changed it." And I commented, "Mr. Asher, I know that is a mail drop and that your Georgia license is suspended."[8] And he jumped out of his chair

---

[8]  Before the search warrant was executed, Cromier had researched Asher's driver's licenses in Georgia and Florida as well as the address listed on the Florida license. T41.

AO 72A
(Rev.8/82)

and started screaming about how his license wasn't suspended and how dare you say that, you don't know. I said, "Mr. Asher, I don't give a damn about your driver's license and you know that is not why I am here. Why I am here is because of this child pornography." Well, I should fill in that when he jumped up, the detective -- lieutenant, you know, stepped forward. He was on the other side of the table. He stepped forward to him and kind of calmed down or whatever and he sat down. And then it got a little heated. You know that is not why I am here, I am here for these types of pictures. I had some pictures that I had printed out.

T16. Cromier let Asher know that she thought he was not being honest with her and that she had concerns about leaving his wife and daughter with him. T42. When he jumped out of his chair, Sellers and another officer in the room grabbed him, sat him back in the chair and told him to calm down. T17[9], 42, 57, 67.[10] The entire incident lasted no more than five seconds. T57. He was never handcuffed. T17, 57. Asher appeared to calm down. T58. Asher did not tell her he did not want to answer questions, nor did he ask to leave the room or consult with a lawyer. T17.

---

[9]     Cromier testified that she did not recall Asher being touched. T17. The Court credits Sellers' testimony that he momentarily grabbed Asher. However, the Court does not find that Cromier's testimony on this point was not credible, but rather simply that it was different than Sellers' due to their respective perceptions and vantage points, as well as the very brief and non-violent nature of the contact that Sellers had with Asher.

[10]     Sellers testified that Asher got angry and stood up when Cromier showed the pictures to Mrs. Asher. T66. The Court does not find the specific time that Asher stood up in anger to be relevant to the issues presented, and therefore need not determine whether Cromier's or Sellers' recall of this event is more accurate.

AO 72A
(Rev.8/82)

As Cromier was showing Asher three or four images of child pornography, including pictures of little girls in bondage, Mrs. Asher came into the dining room, having returned from taking the daughter to school. T18, 42. She asked if she could see them, and Asher said, "No." T19. However, Cromier showed them to her. When Mrs. Asher started to cry, Asher got up from his seat, walked over to her, and put his hand on her shoulder. Mrs. Asher was angry, crying and upset, and pushed Asher's hand off her shoulder and walked out of the room. T19.

As the officers were preparing to leave, Asher asked to get files off of his computer before they left, but Cromier denied that request. T48. She told him to have somebody like a lawyer contact her and she would do her best to get those items back to him. T49. At that point, Asher then signed the receipts for the inventory. T19.[11] Cromier explained that they would be back in touch. T59.

At no time while the officers were in the residence did they unholster their firearms, threaten Asher or physically intimidate him. T19-20. While Cromier was in

_____

[11]     Some time towards the end of the officers' presence in the residence, Cromier approached Mrs. Asher and asked if she was alright and needed a place to stay. Rockdale police had advised Cromier that in the last few months there were approximately 15 hang-up 9-1-1 calls from the Asher residence. Mrs. Asher explained the calls as the result of trouble with their telephone. T34-35. She also stated she would like to speak with someone, and Cromier gave her the name and number of a victim specialist. Mrs. Asher also gave Cromier her cell phone number.

11

the dining room, Asher remained in that room the entire time, and did not ask to leave or go to use the restroom.  T49.

The officers left the house at 9:30 am.  T14.  Asher was not advised of his *Miranda* rights before being interviewed.  T38.

### Contentions of the parties

Asher contends that he was not free to leave his residence while it was being searched and he was being questioned.  Thus, he submits that he was in custody for purposes of *Miranda* and, since his statements were not preceded by *Miranda* warnings, the statements must be excluded from his trial.[12]  Asher first argues that the cases cited by the Court at the conclusion of the evidentiary hearing, for discussion by the parties in their briefs, *see* T71-72,[13] are distinguishable from the present case.  For example, he contends that *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004), is inapposite because it involved an investigative stop of a motor vehicle and not a large group of

---

[12]     Neither party introduced the substance of Asher's statements other than what is recounted in this R&R.  Asher identified Cromier's FD-302, Gov't Exh. 1, which presumably summarized Asher's statements, but did not seek to introduce it.

[13]     Those cases were *Berkemer v. McCarty*, 468 U.S. 420 (1984); *United States v. Acosta*, 363 F.3d 1141 (11th Cir. 2004); *United States v. Patt*, No. 06-CR-6016L, 2008 WL 2915433 (W.D.N.Y. July 24, 2008); and *United States v. Stamps*, CR. No. 2:05CR42-F, 2005 WL 6125472 (M.D. Ala. July 20, 2005) (R&R).

12

armed police officers entering and searching a residence.  He does submit that *Acosta*'s recognition - that *Miranda* warnings are required when a reasonable person would believe he is not free to terminate the interview or leave - supports his position that he did not believe he was free to leave, given the officers' watching him dress, escorting him to the dining room table, separating him from his family and escorting him for a drink of water.  [Doc. 30 at 5].  He further contends that *Berkemer v. McCarty*, 468 U.S. 420 (1984), also is inapplicable because it too involved a public traffic stop.  [Doc. 30 at 5].  Next he argues that *United States v. Patt*, No. 06-CR-6016L, 2008 WL 2915433 (W.D.N.Y. July 24, 2008), is not persuasive because the decision is not binding on this Court, and in any event, unlike the present case, the defendant there was told he was free to leave.  [Doc. 30 at 5].

Instead, he contends that the Court should follow the Ninth Circuit's opinion in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), because it is "strikingly similar" to the present case.  [Doc. 30 at 5].  In *Craighead*, the court held that the suspect was entitled to *Miranda* warnings when he was questioned while his residence was being searched.  Asher argues that like this case, in *Craighead*, while the defendant's home was searched, an FBI agent told Craighead he wanted to discuss the facts in the search warrant.  Like this case, Craighead was told he was not under arrest,

AO 72A
(Rev.8/82)

but unlike this case, he was told he was free to leave.  Also, again like this case, the agents were armed, dressed in flack jackets, were from multiple law enforcement jurisdictions, and separated the defendant from others during the questioning.  Asher points out that the *Craighead* Court recognized the "uniqueness of an investigation conducted within the suspect's home" and held that *Miranda* warnings are required when a suspect is "deprived of his freedom in any significant way."  He then argues that this holding guides the resolution of the present case since, *inter alia*, he was (1) separated from his family, (2) never told he was free to leave, (3) escorted to change his clothes, (4) escorted to get a drink of water after asking permission to have one, and (5) surrounded by armed officers wearing bullet proof vests.  [Doc. 30 at 6-7].

The government responds that Asher was not entitled to *Miranda* warnings because he did not satisfy his burden of showing he was subjected to custodial interrogation.  [Doc. 31 at 5-6].  It cites to Eleventh Circuit and other circuit court opinions which conclude it is less likely to find custodial interrogation " 'in familiar or at least neutral surroundings, such as the suspect's own home.' "  [*Id.* at 6 (quoting *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006))].  It argues that this is particularly true where the suspect is advised he is not under arrest.  [*Id.*].

14

The government further argues that the Eleventh Circuit's test for in-custody for *Miranda* purposes requires the Court to examine the totality of circumstance to determine whether any restrictions placed on a the defendant's freedom of movement were of the degree associated with formal arrest. [*Id.* (citing *Thomas v. Koehane*, 516 U.S. 99, 112-13 (1995))]. These factors include the interview location, whether any physical restraints such as handcuffs or drawn weapons were employed, whether the suspect asked to leave, the officer's demeanor, the degree of pressure applied to the suspect and whether the officers brandished weapons, touched the suspect or used language or a tone indicating that compliance with the officers could be compelled. [Doc. 31 at 7].

The government then argues that although *Acosta* involved a traffic stop, it is instructional here to determine whether Asher was in custody for *Miranda* purposes while his house was being searched pursuant to a warrant. In this regard, the government argues that (1) Asher was interviewed in a familiar setting in his own home while being able to move around, (2) his wife freely entered the dining room while he was being questioned, (3) Mrs. Asher was able to leave the house to take the daughter to school and return, (4) Asher was not handcuffed and only was briefly restrained close to the end of the interview when he aggressively jumped out of his chair in the

15

direction of law enforcement, (5) no weapons were displayed or brandished, (6) the tone of the interview was conversational except when Asher yelled and jumped out of the chair, and (7) he was told he was not arrested and in fact was not arrest until months later. [Doc. 31 at 7-8].

Next the government argues that *Craighead* is not binding on this Court because it is a decision of another circuit. [*Id.* at 8]. Further, it contends that even if *Craighead* is applicable, the factors discussed in *Craighead* support a conclusion that Asher was not in custody for *Miranda* purposes. It argues that while the number of law enforcement officers and agencies favor a finding of custody, as in *Craighead*, the other factors point towards a finding that Asher was not in custody. That is, (1) he was not restrained or handcuffed; (2) unlike the suspect in *Craighead*, he was not in a closed-off room with the only exit being blocked by an armed officer but instead was in his own dining room; (3) he was not isolated from others, and in fact his wife freely walked into the room where he was being interviewed; and (4) while he was not told he was free to leave, he was told that he was not under arrest. [*Id.* at 9].

In addition to reiterating some of the arguments made in his opening brief, Asher replies that the government omits or downplays important facts of this case. [Doc. 32 at 1]. These include (1) the officers were armed and wore bulletproof vests; (2) the

16

officers "stepped in" to the home when Asher answered the door; (3) Asher did not have access to his wife and child because Cromier testified that he was purposely separated from them, T30; (4) agents accompanied Mrs. Asher to wake the daughter and then they were taken to the living room; (5) agents accompanied Mrs. Asher and her daughter so that she could get dressed for school; (6) Asher was told that he was going to be interviewed in the dining room and kept there for two and one-half hours under the guard of two armed police officers, including one in uniform; (7) when he asked for a drink of water, he was escorted into the kitchen; and (8) when he asked Sellers what was going to happen, Sellers responded that he did not know. [Doc. 32 at 2].

Asher also argues that the Court should not credit Cromier because (1) she did not record in her FD-302 that she advised Asher he was not under arrest; and (2) she did not testify that there was any physical contact with him when he jumped up, contrary to Sellers' testimony. [*Id.* at 2-3]. He also contends that *Brown* is distinguishable from his case because there the defendant was asked if he wanted to talk to the police and was told several times he was free to leave. *Brown*, 441 F.3d at 1345. In addition, he points out that the defendant in *Brown* agreed to go to the police station, the officers were not armed, and the defendant was not required to stay in one

17

place.  [Doc. 32 at 3].  He repeats that in his case, at least five armed agents wearing bulletproof vests knocked on his door and entered his home when he answered it, an event that even Cromier described to him as a "scary situation."  [Doc. 32 at 3]; *see* T27.  Further, Cromier told him they "will sit down" and talk, and he was never told he was free to leave or he could terminate the interview.  [*Id.*].  Also, Asher points the Court to the fact that he was escorted to his bedroom and told by Cromier on several occasions that they "were going to talk."  [*Id.* at 4 (citing T8, 10, 29-30)].

Asher also highlights the following facts which he contends made the encounter one in which a reasonable person would not feel free to leave.  That is, (1) he was guarded at the dining room table by two armed guards; (2) Cromier told him she did not believe him and had concerns about leaving his wife and daughter with him; (3) Sellers was standing by the front door in the foyer for 45 minutes; (4) Asher had to be escorted to get a drink; (5) Cromier showed Mrs. Asher the child pornography images over Asher's objections; and (6) when Asher stood up to object he was forced back to his seat by two officers.  [*Id.* at 4].

### Discussion

The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda v. Arizona*,

18

384 U.S. 436 (1966), and were otherwise voluntary. *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *Colorado v. Connelly*, 479 U.S. 156, 168 (1986); *Miranda*, 384 U.S. at 475.

However, a defendant bears the burden of establishing that he was in custody and that his statements were made in response to government questioning. *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.")[14]; *United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984), *overruled on other grounds United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988). There can be no dispute that Asher was questioned by Cromier, so the only issue is whether Asher has satisfied his burden of demonstrating that he was in custody and therefore entitled to *Miranda*'s warnings.

The Eleventh Circuit has held that a subject is in custody for the purposes of *Miranda* when there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Brown*, 441 F.3d 1330,

---

[14]        In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions rendered by the United States Court of Appeals for the Fifth Circuit prior to September 30, 1981.

1347 (11th Cir. 2006)[15] (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)

---

[15]     Asher argues that *Brown* is not applicable because the facts of the case are different than the present case.  While the case certainly has facts distinguishing it from the present case, it is not completely inapposite to this case (and in some respects presents a stronger case of compulsion than the present case).  In any event, the legal principles employed by the Eleventh Circuit in *Brown* are fully applicable to this matter.

In *Brown*, police investigating the murder searched Brown's mother's house pursuant to a warrant and the mother's consent.  *Brown*, 441 F.3d at 1339.  Brown, who frequently stayed at his mother's house, was present during the search and talked with officers while they were in the house.  He confessed three separate times to the murder: once in the house before he was given *Miranda* warnings and arrested, once in the house after he was given *Miranda* warnings and arrested, and once the following morning at the county jail.  *Id.*  He moved to suppress the pre-*Miranda* statement on the grounds that it tainted the later confessions.  *Id.* at 1343-44.  At first, Brown was directed to sit in a chair for 15 minutes while other officers spoke to his mother about consenting.  *Id.* at 1345.  The police then asked him if he was willing to go to the police station to be questioned, and Brown stated that he was, but first he wanted to put on a pair of shoes.  *Id.* at 1344.  The officer accompanied him to the bedroom, where he observed Brown putting on shoes that had a suspicious tread, similar to tread marks found at the murder scene.  Brown was told he could not wear those shoes and that they were going to be seized as evidence.  (Arguably, telling a suspect he cannot wear a particular piece of clothing is far more coercive that anything which occurred in the present case).  Brown stated he did not have any other shoes and did not want to go outside barefoot, so the interview was conducted in his mother's home.  Before the interview, Brown smoked and sat around the dining room table while the officer and Brown were waiting on another officer to arrive.  He was told that he was not under arrest and free to leave at any time.  While officers outside were armed, those who were doing the questioning were not.  During the questioning, the officers noticed that Brown was distracted by his mother's presence, so they moved her into another room to continue the interview.  *Id.* at 1345.

Asher contends that *Brown* is distinguishable because the defendant chose to stay

(quotation marks omitted)); *see also Stansbury v. California*, 511 U.S. 318, 321 (1994)

(noting that an officer's obligation to administer *Miranda* warnings does not attach

until " 'there has been such a restriction on a person's freedom as to render him 'in

custody' ") (citation omitted); *United States v. Street*, 472 F.3d 1298, 1309

(11th Cir. 2006).[16]   "The test is objective; '[t]he only relevant inquiry is how a

---

where the interview was conducted, the police were not armed, Brown was not required to stay in one place and was free to roam about the house, and was told he was free to leave at any time on multiple occasions. [Doc. 32 at 3]. The Court finds these distinctions, such as they are, to not be differences such that the legal principles set forth in *Brown* could not be employed in this case as well. That Brown had a "choice" of locales to be interviewed - his mother's living room (in the house he frequently stayed) or the police station - and Asher was not given such a "choice" is of no moment; they both were interviewed in familiar and familial surroundings. While the police in *Brown* who questioned the defendant were not armed, others on the premises were. In any event, there is no evidence that the officers in the present case displayed or brandished their weapons. Also, the Court surmises that Asher's possession of two firearms of his own presumably demonstrates that he is not intimidated solely by the presence of firearms. While Brown appeared to have been able to roam his mother's house, the record in this case shows that Asher was similarly permitted. For example, without seeking advance permission, he walked into the living room to see his wife. There is no evidence that he was directed to leave the living room. Other than his request for a drink (where, like *Brown*, he was accompanied by an officer), the record is silent as to any other requests to move or attempts (other than Asher's aggressive movement towards Cromier) to move. Finally, while Brown was told he was free to leave, as discussed in the text *infra*, the officers had a lawful reason to keep Asher at the home and, in any event, he was told on at least three occasions that he was not under arrest. Finally, as stated in the text, Asher did not ask to leave.

[16]    As the *Street* Court observed, there is a difference between a "seizure" under the Fourth Amendment and "custody" under the Fifth amendment:

reasonable man in the suspect's position would have understood his situation.' "
*United States v. Muegge*, 225 F.3d 1267, 1270 (11th Cir. 2000) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id.* (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)) (emphasis in *Muegge*); *see also United States v. Torkington*, 874 F.2d 1441, 1445 (11th Cir. 1989) ("The relevant inquiry in this case is whether a reasonable person in [defendant's] position would have felt a restraint on his freedom equivalent to that normally associated with a formal arrest.") (citing *United States v. Phillips*, 812 F.2d 1355, 1359-60 (11th Cir. 1987)).

---

[A] seizure does not necessarily constitute custody for Miranda purposes. *See United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004); *United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir. 2000); *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988) (*en banc*). The standards are different. The Fourth Amendment seizure analysis uses the "free to leave" test: a person is "seized" when "a reasonable person would [not] feel free to terminate the encounter" with the police. *Miller v. Harget*, 458 F.3d 1251, 1257 (11th Cir. 2006). By contrast, a person is in "custody" for *Miranda* purposes only when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125[ ].

*Street*, 472 F.3d at 1309-10.

"Normally, courts apply a two-part test to determine whether a suspect is in custody for *Miranda* purposes: 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation . . . .' " *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The Court cited to *Acosta* at the evidentiary hearing because its reasoning, although addressing whether questioning during a traffic stop amounted to custody for *Miranda* purposes, appears equally applicable to a detention during the execution of a search warrant. That is, the Supreme Court has held that for Fourth Amendment purposes "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (footnote omitted). As the *Acosta* Court recognized, a person temporarily detained pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), during a lawful traffic stop is not free to leave from the beginning of the stop until it ends. The *Acosta* Court noted that "[i]f we applied the general *Miranda* custodial test literally to *Terry* stops, the result would be that *Miranda* warnings are required before any questioning could occur during any *Terry* stop."

23

*Acosta*, 363 F.3d at 1148. Instead, relying upon *Berkemer v. McCarty*, 468 U.S. 420 (1984), the *Acosta* Court held:

> Instead of asking whether a suspect reasonably would feel free to leave, the *Berkemer* Court instead said the question should be "whether a traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.* at 437[ ]. Put another way, suspects "subjected to restraints comparable to those associated with a formal arrest," must be advised of their Miranda rights. *Id.* at 441[ ]; *see also California v. Beheler*, 463 U.S. 1121, 1125[ ] (1983) (per curiam).

*Acosta*, 363 F.3d at 1149.

Similarly, the Court concludes that applying the "free to leave" test in the present case is inappropriate, for two reasons. First, under *Summers*, the officers had the authority to detain Asher. To hold that detention of a suspect while executing a lawful warrant at his residence is the legal equivalent of custody for *Miranda* purposes would run contrary to the Eleventh Circuit's direction to consider the totality of the circumstances in analyzing the issue. *Brown*, 441 F.3d at 1347; *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).[17] Second, the "free to leave" test is

---

[17] The Court recognizes that, in part, many Eleventh Circuit cases use the "free to leave" language in discussing custody for *Miranda* purposes in addition to the "restraint on freedom of movement" language. *See, e.g., McDowell*, 250 F.3d at 1362; *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). These cases are distinguishable from the circumstances of the present case. *Moya* involved an interview of a suspected alien upon entry into the United States. *Id. McDowell*

somewhat ill-fitting when confronted with questioning in the suspect's home because it poses the question, if a suspect is "free to leave" his home to escape police inquiry, where in fact does he go?

Rather, like *Acosta*, the appropriate test to employ in this case is whether here has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Beheler*, 463 U.S. at 1125 (quotation marks omitted); *Brown*, 441 F.3d at 1347. *Acosta* discussed *Berkemer*'s conclusion that certain aspects of a typical traffic stop, such as its relative brevity and that it occurs on the side of a public road in view of the passers by and motoring public, are such that most traffic detainees would not " 'feel[ ] completely at the mercy of the police.' " *Acosta*, 363 F.3d at 1149 (quoting *Berkemer*, 468 U.S. at 438). Thus, these factors might distinguish a traffic stop from a detention during the execution of a search warrant. However, the *Summers* Court pointed to a number of other factors which similarly minimize the intrusiveness

_____

involved a truck driver who was stopped and questioned after picking up a load at a seaport warehouse. 250 F.3d at 1359. Neither of these cases involve an officer's "categorical" authority to detain incident to a search, which does not depend on the "quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure." *Summers*, 452 U.S. at 705 n.19. In any event, the Eleventh Circuit uses a "totality of the circumstances" test whether the description of the test employed is "restraint on freedom of movement of the degree associated with a formal arrest" or "free to leave." *See Brown*, 441 F.3d at 1347 (using both tests interchangeably).

AO 72A
(Rev.8/82)

of such an encounter that keep it from being the equivalent of an arrest. First, by issuing the search warrant, a neutral and detached magistrate already had authorized the substantial invasion of privacy of the persons residing at the searched location, and the detention of one of the residents while the premises were searched, "although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself." *Summers*, 452 U.S. at 701. Second, the Court assumed that most persons "would elect to remain [at their residence] in order to observe the search of their possessions." *Id.* Third, the Court noted that "because the detention . . . was in [the defendant's] own residence, it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station." *Id.* at 702.

The Court is cognizant that the *Summers* Court also found that the detention there was reasonable because "the type of detention imposed here is not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention." *Id.* at 701. On the other hand, in the present case, it is undisputed that the plan from the beginning was for Cromier to attempt to interview Asher, that is, to exploit the detention to gain more information than normally obtained

26

through the search. *See* T5, 46 (describing Cromier's role as to try and talk to Asher).

While this fact is somewhat troubling, the Court ultimately concludes that it is not fatal,

by itself, to the admissibility (over his Fifth amendment objections) of Asher's

statements. First, as discussed, since the Supreme Court has generally approved

detentions during executions of search warrants, the intrusiveness of a particular aspect

of the detention is best evaluated in consideration of all the circumstances of the

detention. Second, as also discussed, the subjective intentions of a law enforcement

officer are irrelevant as to whether the suspect is in custody. Therefore, the Court

concludes that *Summers* supports the lawfulness of the detention in this case, and by

analogy, *Acosta* provides the framework to analyze whether the detention became

custody for purposes of *Miranda*.

In applying this totality of the circumstances test, the Eleventh Circuit directs the

Court to consider several factors, "including whether 'the officers brandished weapons,

touched the suspect, or used language or a tone that indicated that compliance with the

officers could be compelled.' " *Street*, 472 F.3d at 1309 (quoting *United States v. Long*,

866 F.2d 402, 405 (11th Cir. 1989)). Applying these factors, a reasonable person in

Asher's position would not have believed that he was utterly at the mercy of the police,

27

away from the protection of any public scrutiny, and had better confess or else. *Acosta*, 363 F.3d at 1150. As a result, no *Miranda* warnings were required at the time.

First, although the police officers in this case were armed, none of them unholstered or brandished their weapons. Nor did the presence of police officers (even armed ones) wearing bullet-proof vests create a custodial situation envisioned by *Miranda.* Asher does not explain how the officers' ballistic vests would cause a reasonable person in his position to feel "completely at the mercy of the police." *Berkemer*, 468 U.S. at 438. *Cf. United States v. Logan*, 241 F. Supp. 2d 1164, 1177 (D. Kan. 2002) (finding that under totality of circumstances, defendant was not in police custody, noting that "[w]hile the officers may have been wearing bullet-proof vests, they did not draw their weapons, did not handcuff the defendant, and did not otherwise physically restrain him.").[18]

Second, Asher has not shown any evidence of "extensive restraints" comparable to those associated with a formal arrest. *Brown*, 441 F.3d at 1348. He was not handcuffed, patted down, or searched. When he was touched, he was grabbed for no

_____

[18]     Although Asher's subjective beliefs are not particularly pertinent, the Court observes that Asher engaged the sole uniformed officer, Lt. Sellers, who also was wearing a bullet-proof vest, in casual, non-investigation related conversation, Sellers looking familiar to Asher. It would appear then that Asher did not feel intimidated by the bullet-proof vest-wearing officer.

more than five seconds by Sellers and perhaps one other officer, but this incident occurred at the tail end of the interviews and was justified by Asher's own aggressive behavior. In any event, the grabbing was momentary and there is no evidence that Sellers or any other officer used any more force than necessary to prevent Asher from continuing towards Cromier, or that they continued to apply any amount of physical force once Asher immediately calmed down. The defendant will not be heard to complain about the application of relatively minimal physical force used upon him solely because of his own conduct.

Somewhat related to restraints applied against a suspect, it is significant that the interviews took place in Asher's residence. "Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, [c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home." *Brown*, 441 F.3d at 1348 (emphasis in original and citations and internal quotation marks omitted). Although Asher was accompanied throughout the house with at least one, and on occasion two, law enforcement officers, that factor was found not to weigh in favor of a custodial finding in *Brown*, where the defendant was accompanied throughout the house with an officer for safety reasons. *See id.*; *see also United States*

29

*v. Opoku*, 210 Fed. Appx. 848, 852 (11th Cir. 2006) (defendant not in custody where he was not restrained or told he could not leave, the agents did not brandish their guns or use any show of force, and he moved freely about his apartment during the interview, albeit under the agents' supervision as a safety precaution).  Despite the escort, Asher voluntarily entered the living room to see his wife, and there is no evidence that he was told he could not do that or was directed by an officer to the living room.  To the extent that Asher complains that he was separated from his family members, it is significant to the Court that when Mrs. Asher came (voluntarily) into the dining room where he was being questioned, he objected to Cromier showing her the photographs which were the subject of the investigation.   Thus, it is apparent that while he now complains of being separated, at the time of the events relevant to this case, he sought to shield his family from the details of the case.

Also, he was told on multiple occasions he was not under arrest.  *See* T7 (once Cromier was inside home in foyer); T9-10 (while Asher was changing into clothes); T12 (at the beginning of the first interview).[19]   *See Brown*, 441 F.3d at 1347 ("Unambiguously advising a defendant that he is free to leave and is not in custody is

_____

[19]     The Court also notes that on another occasion, Asher indirectly was advised that he was not going to be arrested when Cromier expressed concerns about leaving his wife and child with him.  T42.

a powerful factor in the mix, and generally will lead to the conclusion that the defendant is *not* in custody") (emphasis in original).

The Court recognizes that Asher objects to the Court's conclusion that he was thrice advised he was not under arrest because although this was Cromier's testimony, she did not memorialize this advice in her FD-302. The Court credits Cromier's testimony for several reasons. First, the Court found Cromier to be a credible witness. Second, her testimony about her advice was consistent throughout her testimony and not contradicted by other testimony or evidence. Her testimony that she advised Asher that they were not going anywhere so he did not need shoes and a belt is the kind of detail about ordinary events which causes the Court to find Cromier credible on this point.

The Court recognizes that Asher contends that he was not told he was "free to leave," so that this factor should not count in the government's favor. However, as the Court previously discussed, the officers legitimately could detain Asher pending the conclusion of the search, so the "free to leave" test is not the appropriate standard to employ on the issue of *Miranda* custody in this matter. As noted, the mere fact that

31

Asher was detained, i.e., "seized," does not mean he was in custody for Fifth Amendment purposes.[20]

Additionally, overall the tone of the interview was not such that it "indicated that compliance with the officers could be compelled." *Long*, 866 F.2d at 402. There is no evidence that the questioning was harassing, coercive or threatening. Until the last portion of the interview, Cromier's tone was conversational. This one factor does not show custody for *Miranda* purposes. In this regard, Cromier's pointed questions about the Florida driver's license or statements that she did not believe him did not create an in-custody situation for *Miranda* purposes. "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury*, 511 U.S. at 325; *Berkemer*, 468 U.S. at 442 (officer's subjective intention "has no bearing on the question whether a suspect is 'in custody' "); *see also United States v. Wolfe*, 166 Fed. Appx. 228, 234 (6th Cir. 2006) (officer's confronting defendant with photographs and indicating "that he thought she was lying does not,

---

[20] The Court notes that there is no evidence that Asher did not understand Cromier's advice to him that he was not under arrest. Asher's position simply is that he was not so advised. The Court has rejected that contention in the text *supra* at 31-32.

AO 72A
(Rev.8/82)

without more, transform the encounter into a custodial interrogation") (citing *Oregon v. Mathiason*, 429 U.S. 492, 495-96 (1977) (*per curiam*) (stating that an officer's false statement about having discovered the suspect's fingerprints at the scene had "nothing to do with whether respondent was in custody for purposes of the *Miranda* rule")).

Further, although Asher was detained for about 2 1/2 hours, he was not questioned that entire time. Instead, the interview in all of its segments lasted about 45 minutes. Also, the record is devoid of any evidence that the police did not diligently execute the search warrant or delay their investigation in order to induce Asher to confess. *See Summers*, 452 U.S. at 702 nn.14 & 15.

Finally, although when Cromier appeared at Asher's house, she stated, two or three times, that they would sit down and talk, the Court does not find that these statements coerced Asher to talk or created a coercive, arrest-like atmosphere. They were not in the form of a command or dictate that he had to answer questions.[21]

---

[21] Although Asher's subjective reactions are generally irrelevant in this analysis, the Court observes that despite Cromier's statements, Asher knew he did not have to answer questions because he in fact exercised that right. First, he told Cromier he did not want to answer further questions about his family. T15. Not only did Cromier "not press" him regarding this topic, *id.*, Asher did not answer those questions. Second, Asher immediately answered Mrs. Asher's question when she asked whether she could view the child pornography, and sought to prevent Cromier from showing her the images.

AO 72A
(Rev.8/82)

In short, the totality of the circumstances convinces the Court that the situation "did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *United States v. Crawford*, 294 Fed. Appx. 466, 474 (11th Cir. 2008) (quoting *Acosta*, 363 F.3d at 1150).

Nor does the Court find *Craighead* instructive or compelling a different result. First, this Court is not bound by that decision, since it is not a decision of the Eleventh Circuit. *Cf. United States v. Torres*, 318 F.3d 1058, 1064 n.8 (11th Cir. 2003) (citing *OSI, Inc. v. United States*, 285 F.3d 947, 952 n. 3 (11th Cir. 2002) (which held that "we are not bound by decisions of our sister circuits")).

More important, even if *Craighead* was instructional, its facts are clearly distinguishable from the present case in significant respects. Like here, investigators traced child pornography distribution over a peer-to-peer file-sharing network back to an IP address at the defendant's residence, and as a result obtained a federal search warrant for his residence. 539 F.3d at 1077-78. Craighead was an electronic warfare technician in the U.S. Air Force, and lived in on-base housing. The search team of eight law enforcement officers included five FBI agents, a local detective and two members of the Air Force Office of Special Investigations. They were accompanied by Air Force Sergeant Ramsey, who the government represented was present for

34

Craighead's "emotional support" but who also was his "first sergeant," a superior with authority over him, as well as an FBI evidence collection clerk. *Id.* at 1079. All of the law enforcement officers were armed; some of them unholstered their firearms in Craighead's presence during the search. All of the FBI agents were wearing flak jackets or "raid vests." *Id.* at 1078. Craighead was told he was free to leave and would not be arrested regardless of what was located during the search. However, as the *Craighead* opinion relates:

> [The FBI agent and local detective] then directed Craighead to a storage room at the back of his house, "where [they] could have a private conversation." [The FBI agent] did not handcuff Craighead at any point while escorting him to the storage room nor during the interview that followed. As [the FBI agent] described the storage room, it was cluttered with boxes. She could not recall whether Craighead sat on a box, or whether he sat on a chair grabbed from the kitchen. [The FBI agent] squatted on the ground, taking notes. [The d]etective stood leaning against the wall near the exit, with his back to the door. [The d]etective wore a flak jacket and a sidearm. [The FBI agent] testified that they shut the door "for privacy." Although Sergeant Ramsey had ostensibly been brought along to provide emotional support for Craighead, he was not permitted to accompany Craighead into the storage room. [The FBI agent] testified that this was because he was "non-law enforcement" and therefore would "never" be permitted to be present during an FBI interview.

*Craighead*, 539 F.3d at 1079.

The *Craighead* Court concluded that the interrogation was custodial. In doing so, it first recognized that interrogation within a suspect's home is not *per se* custodial

because the element of compulsion which concerned the *Miranda* Court is less likely present in a suspect's familiar surroundings. *Id.* at 1083. However, it noted that *Miranda*'s warnings were required where a suspect was "deprived of his freedom of action in any significant way," similar to the situation in which the suspect was taken into custody at the police station, such as the " 'incommunicado interrogation of individuals in a police-dominated atmosphere.' " *Craighead*, 539 F.3d at 1083 (quoting *Miranda*, 384 U.S. at 445, 477, and noting *Miranda*'s identification of the salient feature being that the suspect was "cut off from the outside world").

As a result, the *Craighead* Court, in applying *Miranda* to the task of sorting a non-custodial in-home interrogation from a custodial one, considered "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.' " *Id.* The Court, drawing on opinions from other Circuits,[22] then set out a non-exhaustive set of factors to be considered in deciding whether the circumstances of a particular in-home interrogation effected a police-dominated atmosphere: (1) the number of law

---

[22]  *United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007); *United States v. Mittel-Carey*, 493 F.3d 36, 39 (1st Cir. 2007); *Sprosty v. Buchler*, 79 F.3d 635, 641 (7th Cir. 1996); *United States v. Griffin*, 922 F.2d 1343, 1348049 (8th Cir. 1990). *See Craighead*, 539 F.3d at 1084 n.3.

enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made. *Id.* at 1084.

In applying these factors, the *Craighead* Court first noted that the eight armed officers representing three police agencies, some of whom unholstered their weapons, and accompanied by two others including the suspect's superior officer, entered Craighead's house. The defendant testified that he did not know if the agencies were acting in coordination, such that when the FBI agent told him he was free to leave, he was not sure that she spoke for all of the officers/jurisdictions. The court concluded that a reasonable person in the defendant's position would feel that his home was dominated by law enforcement agents and that they had come prepared for a confrontation. *Id.* at 1085.

The Court distinguishes the instant case from *Craighead*'s conclusions on this factor, on several grounds. First, putting aside the reasonableness of Craighead's testimony that he was unsure whether the FBI agent in his case spoke for all the agencies represented, it is clear in the present case that Cromier was the lead agent and

that the other members of the search team followed her orders. Thus, when she told Asher he was not going to be arrested, there could be no doubt that she spoke for all the agencies on the scene. Second, no officers unholstered their weapons in the present case. Third, the fact that Craighead was in the military, lived in base housing and the search team was accompanied by one who was a superior officer, is completely different from this case, where Asher lived in his private home with his family and was not effected by the military chain of command.

Second, the *Craighead* Court considered whether the suspect was restrained at any point by physical force or threats, noting that when law enforcement agents restrain the ability of the suspect to move - particularly through physical restraints, but also through threats or intimidation - a suspect may reasonably feel he is subject to police domination within his own home and thus not free to leave or terminate the interrogation. *Id.* at 1085 (citing *Orozco v. Texas*, 394 U.S. 324, 325, 327 (1969), which found custody where four officers entered the suspect's bedroom and acted as though he was "not free to leave," but did not actually handcuff or physically subdue him). The court also noted that restraint amounting to custody may also be inferred where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times. *Id.* It also favorably

38

cited *Sprosty*, 79 F.3d at 642-43, where the court found that police officers' use of their police cars to block the suspect's driveway to prevent his departure, and their standing so as to block the suspect's exit path from his home, contributed to a custodial environment. *Craighead*, 539 F.3d at 1085. The *Craighead* Court found that, although Craighead was not handcuffed or physically restrained, he was interviewed in a back storage room with the door closed and blocked by a detective who leaned up against the door. The court concluded that "these facts demonstrate that Craighead's freedom of action was restrained in a way that increased the likelihood that Craighead would succumb to police pressure to incriminate himself." *Id*. at 1086.

To the extent that this *Craighead* factor is instructive in the present case, this case is different. First, the Eleventh Circuit has recognized that escorting a subject around his own home while it is searched does not create a custodial situation. *See Opoku*, 210 Fed. Appx. at 852. Second, while Sellers' vehicle blocked the driveway, he moved it when Mrs. Asher left to take the daughter to school and did not thereafter block the driveway. Even if the driveway was still blocked when Cromier conducted the initial and bulk of the interview with Asher, this singular fact would not compel a conclusion that Asher was in custody for *Miranda* purposes. There is no evidence that Asher sought to leave the residence, and since he worked from home, it

39

is reasonable to assume that he had no intention of leaving the house regardless of the presence of Sellers' vehicle in the driveway.

More significant, however, and the overarching distinguishing characteristic between this case and *Craighead*, is that Asher was not secured in a closed room while he was interviewed. Instead, he was seated at his own dining room table, from which he was able to go get a drink and visit the living room where his wife was seated, and which room was easily accessed by Mrs. Asher. His ingress and egress from this room was not blocked.

The *Craighead* Court also noted that the suspect was isolated from others, particularly the sergeant who was brought along (unbeknownst to Craighead) for the defendant's emotional support. *Craighead*, 539 F.3d at 1086-87. In this case, Asher was not isolated from his family although Mrs. Asher (and until she went to school, the daughter) were seated in the living room while Asher was in the dining room. Despite this separation, Asher walked into the living room after getting a drink. Mrs. Asher came into the dining room while he was being interviewed. This fact materially distinguishes *Craighead*, where the court observed that "it [was] difficult to see how Craighead was free to leave if he was, apparently, not free to invite others into the storage room of his own house." *Id.* at 1087. Also, as noted before, while Cromier

40

testified that the Ashers were put in separate rooms so that Asher could be interviewed alone, given Asher's objections to Mrs. Asher's viewing of the computer-generated images, it is difficult to see how he viewed the separation from his wife and daughter as a custodial situation.

Finally, the *Craighead* Court stated that notwithstanding the FBI agent's admonitions to him that he was free to leave, the presence of three police agencies reasonably left the suspect with doubt whether the agent had the authority to pronounce him free to leave. Also, to have left, he would have had to get by the detective blocking the door. Finally, it noted that

> [a]n interview conducted in a suspect's kitchen, living room, or bedroom might allow the suspect to take comfort in the familiar surroundings of the home and decrease the sensation of being isolated in a police-dominated atmosphere. Here, [the FBI agent] escorted the suspect to a storage room in back of the house. The room was unfurnished. [The FBI agent] testified that she herself was squatting on the floor, and that Craighead was probably sitting on a box or a chair grabbed from another room. The room had a single door. In front of the door stood an armed detective wearing a raid vest. Beyond the door were six more officers searching his house.

*Id.* at 1088-89. Therefore, the court held that while the FBI agent told the defendant he was "free to leave" and that his statements were voluntary, a reasonable person in his position would not have actually "felt" he was free to leave. *Id.* at 1089.

41

The present case is different. Asher repeatedly was advised he was not under arrest before the questioning began. This advice was given to him in his foyer, in his master bedroom and in the dining room. Asher was interviewed in his dining room, if not in view of, then with easy access to, his wife. Although Lt. Sellers was alternately in the foyer and dining room, he did not block Asher's access to any part of the house or its exits. In fact, Asher conversed causally with Lt. Sellers, whose sole role appeared to be to provide uniformed police presence. Further, Asher obviously recognized his ability to terminate the interview or portions of it at any time, because there were questions he would not answer and he tried to prevent his wife from viewing the pornographic images.

As a result, Asher was not in custody for purposes of *Miranda* and therefore his motion to suppress statements is due to be denied.

### *Conclusion*

For all the above reasons, the undersigned **RECOMMENDS** that Defendant Asher's motion to suppress statements, [Doc. 19], be **DENIED**.

The Court has now ruled on all pretrial motions, and has not been advised of any impediments to the scheduling of trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

AO 72A
(Rev.8/82)

**IT IS SO RECOMMENDED and CERTIFIED**, this ___25th___ day of February, 2010.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)