## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES,

                          Plaintiff,

       v.                                        **1:09-CR-414-WSD-AJB-1**

MICHAEL ASHER,

                          Defendant.

### OPINION AND ORDER

This matter is before the Court on Defendant Michael Asher's ("Defendant" or "Asher") Objections [37] to the Report and Recommendation ("R&R") of Magistrate Judge Alan J. Baverman [33] recommending denial of the Defendant's Motion to Suppress Statements [19]. An evidentiary hearing on the motion to suppress the Defendant's statements was conducted before Magistrate Judge Baverman on November 6, 2009 [29].

## I.  STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59; Williams v. Wainwright, 681 F.2d 732 (11th Cir. 1982), cert. denied, 459 U.S.

1112 (1983).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).  This requires that the district judge "give fresh consideration to those issues to which specific objection has been made by a party."  Jeffrey S. v. State Bd. of Educ. of Ga., 896 F.2d 507, 512 (11th Cir. 1990) (internal citations omitted).  "It is critical that the objection be sufficiently specific and not a general objection to the report."  Macort v. Prem. Inc., 208 F. App'x 781, 784 (11th Cir. 2006).  With respect to those findings and recommendations to which objections have not been asserted, the Court must conduct a plain error review of the record.  United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983), cert. denied, 464 U.S. 1050 (1984).

## II.    BACKGROUND

The Defendant is charged with receiving child pornography, 18 U.S.C. § 2252(a)(2) and (b) (Count 1), and possessing a computer containing child pornography, 18 U.S.C. § 2252(a)(4)(B) (Count 2).  The Defendant seeks to suppress statements he made to law enforcement officers during a search of his home pursuant to a valid, federal search warrant.

2

The Court briefly summarizes the key facts of the case.[1]  FBI Special Agent Joan Cromier ("Cromier") of the FBI's Innocent Images Squad received information from law enforcement officers in Maryland about a peer-to-peer file sharing program containing images of child pornography downloaded from an IP ("Internet Protocol") address that was traced to the Defendant's address in Conyers, Georgia.  Cromier, after further investigation, obtained a warrant to search the Defendant's residence.  The warrant was executed on February 19, 2009.

The search team was comprised of eight law enforcement officers, consisting of FBI Agents, including Cromier, and local police officers and detectives, including Lieutenant Michael Sellers, a Rockdale County Sheriff's Department officer.  Cromier, as the lead agent on the warrant, planned to try to talk to the Defendant when the warrant was executed.  The team executed the warrant at 7:00 am.

With five officers around her, Cromier knocked on the front door of the Defendant's residence.  The Defendant answered the door, Cromier identified herself and explained that they were there to execute a search warrant.  Cromier testified that the Defendant let the officers into his house.  The Defendant contends

---

[1] The facts are more fully explained in the R&R.

that various officers entered his house when the door was answered and that the

Defendant did not let them in.[2]  Sellers and one or two officers remained outside

the house for security reasons.  All of the officers wore sidearms, but no weapons

were drawn when the officers entered the home.

Once inside of the house, Cromier told the Defendant that the search warrant

was for computers, that no one was under arrest, and that the officers planned to

get what they needed and leave.  Cromier also told the Defendant that they first

needed to conduct a security sweep of his house to insure that no one else was

there, and then they could sit down and "really discuss the details . . . ."  (Ev. Hr'g

Tr. 8, Nov. 6, 2009).[3]  The Defendant asked if he could change his clothes and

Cromier replied that he could, but first wanted to know if anyone else was in the

---

[2] The Magistrate Judge gave credit to Cromier's testimony.  United States v.
Dorvilus, 357 F. App'x 239, 244 (11th Cir. 2009) (district court can accept a
magistrate judge's credibility findings without conducting a new evidentiary
hearing) (citing United States v. Raddatz, 447 U.S. 667, 674-676 (1980)).  Whether
the Defendant actually let the officers into his house is irrelevant, since the search
warrant gave the officers the lawful authority to enter his house with or without the
Defendant's consent.  See Tokar v. Bowersox, 198 F.3d 1039, 1048 n.10 (8th Cir.
1999) (the issue of consent was "irrelevant because the officers had a search
warrant for [the] house"); U.S. v. Jones, 2008 WL 1848789, at *1 n.3 (S.D. Fla.
Apr. 23, 2008) (the consent issue is not relevant where a search is conducted
pursuant to a valid search warrant); United States. v. Baker, 206 F. App'x 928, 1
(11th Cir. 2006) (voluntary consent for a search is required in the absence of a
warrant); cf. United States v. Brown, 370 F. App'x 18, 2 (11th Cir. 2010) (a valid
search warrant requires probable cause).
[3] During the security sweep, two long guns were found in the master bedroom and
were not taken from the residence.

house.  The Defendant's wife, Tatiana Asher, then entered the foyer.  The

Defendant said his son was on vacation and that his 10-year old daughter was

sleeping upstairs.  One of the officers followed Mrs. Asher upstairs to wake her

daughter who was then escorted to the living room, where Mrs. Asher and her

daughter were interviewed.

  Cromier and another officer escorted the Defendant to the master bedroom

so he could change his clothing.  As the Defendant was getting dressed, Cromier

informed the Defendant that she and the officers were not going to take him

anywhere, that the Defendant was not under arrest, and that they were "just going

to talk in the living room or wherever."  (Ev. Hr'g Tr. 10, Nov. 6, 2009).  After the

Defendant changed, he and the officers went into the dining room and sat down at

a table.  The officers wanted to interview the Defendant without his wife or

daughter present.  Cromier and another officer stayed with the Defendant while

other officers continued searching the house.

  The officers did not handcuff the Defendant or any person at the home.  The

officers escorted the Ashers when they moved within the house, but they did not

force them to stay in a specific room nor prevent them from moving from one

room to another.  The search team clearly identified themselves as law

enforcement officers.  At the search, Cromier had a jacket with "FBI" written on

the back, the other officers wore khakis and ballistic vests, and Sellers, who entered the house after the other officers, was in uniform.

Cromier conducted most of the initial interview of the Defendant in a conversational tone. She explained they were there to execute a search warrant, not to arrest anyone.[4] She informed him that another agent went on the peer-to-peer filing sharing program "Giga Tribe" and had identified child pornography images that were traced to an IP address at the Defendant's residence. She informed the Defendant that the officers were going to seize the computers found in his home. She asked the Defendant if there were child pornography images on the computers in his house. He guaranteed the computers did not contain such images and that his son was not involved in downloading child pornography. When asked about the computers in the house, the Defendant said he used a few computers for work, including a desktop, laptops, and a "couple of junkers," which were kept in his office upstairs, and that his wife, son, and daughter each had their own computer. (Ev. Hr'g Tr. 33, Nov. 6, 2009). The Defendant told Cromier that

---

[4] The Defendant argued that the Court should not accept as true that Cromier told the Defendant three times, that he was not under arrest because Cromier did not record these statements in her official report of the interview. The Magistrate Judge found Cromier's testimony to be credible and the Defendant did not offer any evidence to dispute Cromier's testimony.

he worked from home as a computer programmer for AT&T, that he was only a project manager, and that his computer skills were self-taught.

When Cromier asked the Defendant about his family, the Defendant declared that he did not want to answer personal questions. Cromier respected his wishes and moved to other topics.

After Cromier had spoken to the Defendant for about thirty minutes and the officers had been at the Ashers' residence for one, to one and a half, hours, Cromier asked Mrs. Asher if she had to go to work or take her daughter to school. Mrs. Asher said she had to take her daughter to school and Sellers moved his patrol car so that Mrs. Asher could take her daughter to class. Mrs. Asher later returned to the house.

Cromier, on a few occasions, interrupted the interview and left the dining room to participate in the search. At least one officer, generally Sellers, stayed with the Defendant in the dining room when Cromier was gone. At some point, the Defendant and Sellers talked about the school system in which Sellers' and the Defendant's children were enrolled. The Defendant asked Sellers what he thought would happen to him. Sellers responded that he did not know, but suggested the Defendant tell the truth.

At some point, Cromier asked the Defendant about pills she had found in his house.  He said it was Viagra he purchased over the Internet.  At some point, and for about 15 minutes, the tone of the interview became more confrontational.  This more confrontational discussion occurred after Cromier found the Defendant's Florida driver's license in his wallet.  She asked the Defendant why he had a Florida driver's license and what was the address listed on the license.  The Defendant stated, "it is an address."  (Ev. Hr'g Tr. 16, Nov. 6, 2009).  When pressed further, he said the address was an apartment where he used to live and that he had never changed the address to his current residence.  Cromier then stated, "I know that this is a mail drop and that your Georgia license is suspended."[5]  Id.  The Defendant "jumped out of his chair and started screaming about how his license wasn't suspended and how dare you say that, you don't know."  Id.  Sellers testified that it seemed like the Defendant "was going to take a step towards [Cromier]," so he and another officer briefly grabbed the Defendant,[6] sat him back in the chair, and told him to calm down.[7]  (Ev. Hr'g Tr. 57, Nov. 6,

[5] Before the search, Cromier had looked up the Defendant's driver licenses in Georgia and Florida and the address listed on the Florida license.
[6] Cromier did not recall any of the officers grabbing the Defendant.  The Magistrate Judge concluded that Sellers' testimony was more accurate based on Sellers' vantage point compared to that of Cromier.
[7] Sellers testified that the Defendant stood up when Cromier showed the child pornography images to Mrs. Asher.  The Magistrate Judge did not find the specific

2009).  The physical contact with Defendant lasted no more than five seconds.

The Defendant eventually calmed down and he continued to answer questions.

The Defendant did not ask to leave the room and did not ask to consult a lawyer.

At some point, Cromier showed the Defendant a few images of child

pornography.  While this was ongoing, Mrs. Asher walked into the room and said

she wanted to see the pictures.  The Defendant said, "no," but Cromier showed the

images to Mrs. Asher anyway.  (Ev. Hr'g Tr. 19, Nov. 6, 2009).  Mrs. Asher began

to cry and the Defendant went over to console her by touching her on the shoulder.

This angered Mrs. Asher who pushed him away and walked out of the room.

Before the officers left, the Defendant asked if he could get some files off of

his computer.  Cromier refused and told him that if he had a lawyer contact her,

she would try to return the files he wanted.  The Defendant signed receipts for the

inventory and the officers left the house around 9:30 am.

The officers at the search did not remove their firearms from their holsters

and did not threaten the Defendant.  While the Defendant was in the dining room

with Cromier, he did not ask to leave the room.  He was not advised of his

*Miranda* rights before being questioned.

---

moment that the Defendant stood up in anger to be relevant, and therefore did not
decide which officer's recollection of the event was more accurate.  The Court
agrees.

On September 23, 2009, the Defendant was indicted on receiving child pornography and possessing a computer containing child pornography.  On October 8, 2009, the Defendant moved to suppress statements he made to the officers during the search of his home, alleging that he was questioned and detained without receiving his *Miranda* warnings.  On February 25, 2010, the Magistrate Judge recommended in the R&R that his motion to suppress be denied, concluding he was not in custody and thus *Miranda* warnings were not required to be given.

The Defendant objects to the recommendation in the R&R that his motion to suppress his statements be denied.  He contends that the Magistrate Judge added new facts, mischaracterized the facts, applied the wrong case law, and reached incorrect legal conclusions.  The Court reviews these objections *de novo*.  Those findings and recommendations to which an objection was not asserted are reviewed for plain error.

III.   **DISCUSSION**

A.   Whether the Magistrate Judge misstated the facts

The Defendant contends that he did not *let* the officers into his home to search his house as Cromier testified, but that the officers entered without permission when the Defendant opened his door.  The Magistrate Judge found,

based on Cromier's testimony, that the Defendant consented for the search team to enter his home.  The Court accepts this finding as consistent with the facts developed at the evidentiary hearing.  See United States v. Dorvilus, 357 F. App'x 239, 244 (11th Cir. 2009) (district court can accept a magistrate judge's credibility findings without conducting a new evidentiary hearing) (citing United States v. Raddatz, 447 U.S. 667, 674-676 (1980)).  The Court also finds that law enforcement personnel were allowed to be on the Defendant's premises to execute the search warrant that had been issued.

The Defendant next objects to the Magistrate Judge's statement that the Defendant and Sellers "walked into the living room where Mrs. Asher was seated before returning to the dining room."  R&R at 9.[8]  At the evidentiary hearing, Sellers stated that he and the Defendant "might have" walked into the room where Mrs. Asher was before returning to the dining room.  (Ev. Hr'g Tr. 64, Nov. 6, 2009).  The Magistrate Judge should have taken note of Sellers' qualification of this event when reciting this fact in the R&R.  However, the Defendant does not

---

[8] The Defendant mentions several facts that the Magistrate Judge recorded in the R&R, but does not state an objection to these facts or in what respect he disagrees with the Magistrate Judge's finding regarding these facts.  The facts he mentions include: that the officers did not speak to Mrs. Asher about whether she had to take her daughter to school until the officers were at the Asher residence for one and a half hours; that the agents escorted the Defendant's daughter to her bedroom so she could get dressed for school; and that Sellers had to move his car so that Mrs. Asher could take her daughter to school.

claim that he did not walk into the room where his wife was sitting during the search, and he does not claim that entry into the room where Mrs. Asher was seated impacted the statements he made.

The Defendant claims the Magistrate Judge confused the *family* room and the *living* room at the Asher residence.  The R&R does not mention a *family* room, and it is not clear from the evidentiary hearing whether these are two separate rooms or are simply different terms for the same room.  This objection is unfounded and does not address a matter material to the consideration of the Defendant's motion.

Finally, the Defendant asserts that the officers drew their weapons during the search and that the Magistrate Judge stated, without any basis, that the Defendant's personal ownership of two rifles "demonstrated that he is not intimidated solely by the presence of firearms."  R&R at 21 n.15.  The Magistrate Judge credited the testimony at the hearing that weapons were not drawn or brandished.  If they were, there is no evidence that any deploy of the weapons impacted the Defendant or were displayed in such a way that a reasonable person, as opposed to a particular individual, believed they were at the mercy of the police.  See R&R at 27-28; United States v. Acosta, 363 F.3d 1141, 1150 (11th Cir. 2004).

The Court finds, upon de novo review, that the Defendants' factual objections are not well-founded and do not contain evidence to support a finding that the Defendant was in custody at any time during the search or interview. The objections are overruled.

B.    Whether the Magistrate Judge applied the correct law

The Defendant contends that the test for determining whether a person is in custody for *Miranda* purposes is whether that person felt free to leave. See United States v. Phillips, 812 F.2d 1355, 1361 (11th Cir. 1987). The Defendant argues that applying the "free to leave" test, the Magistrate Judge was required to find the Defendant was in custody and *Miranda* warnings were required to be read to him.

"[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 693, 705 (1981); see United States v. Sears, 139 F. App'x 162, 165-166 (11th Cir. 2005) (a valid warrant to search a residence gave the officers a basis to detain the resident during the search); Terry v. Ohio, 392 U.S. 1 (1968) (officers may briefly and lawfully detain persons without arresting them first). Detaining a suspect while executing a lawful search warrant does not automatically render the suspect in custody for purposes of *Miranda* warnings. United States v. Brown, 441 F.3d 1330, 1347

(11th Cir. 2006).  The lawful detention of a suspect may ripen into an unlawful

detention under certain circumstances, but a brief detention is lawful even if it

restrains the suspect's freedom.  Acosta, 363 F.3d at 1147.  The defendant bears

the burden of establishing that he was in custody for purposes of *Miranda*.  United

States v. Mwangi, 2010 WL 520793, at *3 (N.D. Ga. Feb. 5, 2010); United States

v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[9]

A suspect is in custody for purposes of *Miranda* if there has been a "formal

arrest or restraint on freedom of movement of the degree associated with a formal

arrest."  California v. Beheler, 463 U.S. 1121, 1125 (1983).  "The test is objective:

the actual, subjective beliefs of the defendant and the interviewing officer on

whether the defendant was free to leave are irrelevant."  Brown, 441 F.3d at 1347

(citations omitted).  Whether a suspect is in custody for *Miranda* purposes is

determined using a two-part test: "[1] what were the circumstances surrounding the

interrogation; and [2], given those circumstances, would a reasonable person have

felt he or she was not at liberty to terminate the interrogation and leave."  Acosta,

363 F.3d at 1148 (citing Thompson v. Keohane, 516 U.S. 99, 112 (1995)).  Courts

should look at the totality of the circumstances and determine "how a reasonable

---

[9] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh
Circuit adopted as binding precedent all decisions rendered by the United States
Court of Appeals for the Fifth Circuit prior to September 30, 1981.

person in the position of the individual being questioned would gauge the breadth

of his or her freedom of action."  United States v. Lall, 607 F.3d 1277, 1284 (11th

Cir. 2010) (citations omitted).

The Eleventh Circuit recognizes that "courts are *much* less *likely* to find the

circumstances custodial when the interrogation occurs in familiar or at least neutral

surroundings, such as the suspect's home."  United States v. Gomes, 279 F. App'x

861, 868 (11th Cir. 2008) (citing Brown, 441 F.3d at 1348).  Courts look at several

factors in determining whether a suspect was in custody, including whether the

suspect was physically restrained or told he was under arrest.  Id. at 868.  Courts

also look at whether "the officers brandished weapons, touched the suspect, or

used language or a tone that indicated that compliance with the officers could be

compelled."  United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006).[10]

Cromier interviewed the Defendant in the familiar environment of his own

home.  See Gomes, 279 F. App's at 868.  Although the Defendant was

accompanied by an officer in his home, he was free to move around his residence.

See Brown, 441 F.3d at 1348-1349.  The Defendant was not physically restrained

---

[10] The "free to leave" test determines whether a defendant is seized under the
Fourth Amendment, which is different from the test that analyzes whether a
defendant is in custody for *Miranda* purposes.  Street, 472 F.3d at 1310.  Although
a few cases use the "free to leave" language while discussing custody for *Miranda*
purposes,[10] the Eleventh Circuit considers the "totality of the circumstances" when
determining custody under *Miranda*.  See id.; Brown, 441 F.3d at 1349.

during the interview and the only moment that any officer touched him was when Sellers and another officer briefly grabbed the Defendant because he stepped towards Cromier in an aggressive manner.  This moment of "physical restraint" lasted at most five seconds and ceased as soon as the Defendant calmed down. The Defendant was told three times that he was not under arrest.  The officers' weapons remained in holsters during the entire search.  The interview was concluded in a conversational tone, but for the very short discussion about the Defendant's driver's license and address, but continued in a conversational tone after this brief exchange about the driver's license.  The totality of the circumstances showed that the Defendant was not in custody.  The Defendant knew he was free to terminate the interview, and a reasonable person in his situation would have felt he was free to terminate the interview at any time.  The Defendant has not shown he was in custody and *Miranda* warnings were not required.

The Defendant urges the Court to follow the Ninth Circuit in United States v. Craighead, 539 F.3d 1073 (9th Cir. 2008), a case involving an individual detained during the execution of a search warrant.  A decision of the Ninth Circuit is, of course, not controlling here.  See OSI, Inc. v. United States, 285 F.3d 947, 952 n.3 (11th Cir. 2002).  Even if it was, Craighead is distinguished from the facts

in this case.  In <u>Craighead</u>, the officers isolated the suspect in a storage room in his

house and did not let anyone other than officers into the room.  <u>Craighead</u>, 539

F.3d at 1087.[11]  The Defendant's objection based on his claim that he was in

custody and that *Miranda* warnings were required is, after de novo review,

overruled.

## IV.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Court **ADOPTS** Magistrate Judge

Alan J. Baverman's Report and Recommendation [33] and Defendant Michael

Asher's Objections [37] to the R&R are **OVERRULED.**

**IT IS FURTHER ORDERED** that the Defendant's Motion to Suppress

Statements [19] is **DENIED.**

**SO ORDERED** this 21st day of October, 2010.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[11] In the Ninth Circuit, when an officer escorts a suspect around the house, the officer is restraining him, which favors a finding that the suspect is in custody. <u>Craighead</u>, 539 F.3d at 1085.  In the Eleventh Circuit, when an officer merely follows a suspect around his house, the officer is not restraining him.  <u>United States v. Opoku</u>, 210 F. App'x 848, 852 (11th Cir. 2006).