IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal Action |
| | : | |
| v. | : | No. 1:09-CR-00414-MHC-AJB |
| | : | |
| MICHAEL ASHER | : | |

**MOTION FOR COMPASSIONATE RELEASE PURSUANT
TO 18 U.S.C. § 3582(c)(1)(A)(i)**

The Defendant, Michael Asher, pursuant to the compassionate release

statute, 18 U.S.C. § 3582(c)(1)(A)(i), files this motion asking the Court to reduce

his prison sentence to time served. Mr. Asher is wheelchair bound[1] due to early

onset Parkinson's Disease[2], a progressive neuro-degenerative disorder, with

swallowing problems (dysphagia).[3]  He also suffers from chronic heart disease,

---

[1] Mr. Asher's supporting current medical records will be provided to the Court
and the government privately.  His pre-sentencing medical records are not
reflected on the docket, but were filed under seal on January 16, 2013, and
discussed in Mr. Asher's Sentencing Memorandum. Doc. 130 at 27-32.  The
records were reflected in Mr. Asher's PSR at ¶¶ 61-62.

[2] Pneumonia is the leading cause of death in patients with Parkinson's disease.
*Risk factors for pneumonia among patients with Parkinson's disease: a Taiwan
nationwide population-based study*, available at
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4854270/ (last visited May
18, 2020).

[3] Complications of dysphagia in PD can include aspiration pneumonia,
malnutrition, and dehydration. Sp*eech and Swallowing in Parkinson's Disease*,
available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2784698/ (last
visited May 18, 2020).

hypertension and arrhythmia, all of which make him more susceptible to being infected with COVID-19 and more likely to need to be hospitalized, be put on a ventilator, or even more tragically, to die. In addition, he has constant and severe neck and back pain and headaches, and while not yet diagnosed because Mr. Asher is awaiting a CT scan, the medical records suggest that he could have Ankylosing Spondylitis, an autoimmune disease.[4]

Despite his debilitating health issues, Mr. Asher has used his time in custody to help other inmates by tutoring thousands of GED candidates. He has helped hundreds of inmates get their GED every year while at Coleman and then at Jessup. He has also taught classes in Creative Writing, Economics, Computer Programming and more.[5]

Mr. Asher was on bond prior to his trial for over a year with no violations, and was only taken into custody at the return of the guilty verdict on December 9, 2010.[6] Since being taken into custody, Mr. Asher has completely lost his ability to walk and is now 100% wheelchair bound.[7] He has been in continuous custody for almost nine and one-half years. He is eligible for Home Detention in less than a year on April 14, 2021 and is scheduled for release, based on his good conduct, on October 14, 2021, or in a little over a year and a half.[8] Thus, so he has

---

[4] https://www.aarda.org/diseaseinfo/ankylosing-spondylitis/

[5] See, Attachment A, Asher, Michael - BOP Inmate Records - 000006.

[6] PSR ¶ 6.

[7] Attachment A at 000006.

[8] *Id.*

served close to 90% of his sentence.  During that entire time, Mr. Asher has not committed even one disciplinary infraction. [9]

Finally, Mr. Asher has a reentry plan that will allow him to abide by all terms of supervised release and sex offender registry, while also allowing him to get needed healthcare and isolation.  He will live with his wife, who is a teacher, and will be on her healthcare plan.[10]  Her house is in a semi-rural setting and was chosen with sex offender registration in mind.  His children are adults and he has no grandchildren.  No minor children reside with his wife.  These factors and other 18 U.S.C. § 3553(a) factors warrant his immediate release.[11]

## Introduction

The compassionate release statute, as originally written, authorized the BOP to file in court a motion for reduction of sentence based on compassionate release, but if it refused to file such a motion, a defendant had no right to file one on his own. Recognizing this as a serious problem, a bi-partisan Congress passed The First Step Act to solve this problem. The statute now allows a defendant to file in the district court a motion on his own behalf, so long as he first seeks, or tries to seek, administrative remedies. Once that motion is filed, a sentencing court is empowered to reduce a defendant's prison sentence if, after consideration of the factors set forth in 18 U.S.C. § 3553(a), it finds that "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i).  Mr. Asher's circumstances—his health problems and the

---

[9] *Id.* at 000001.

[10] Attachment D at 2.

[11] While it hardly seems necessary, the Court could modify the 20 years of supervised release to include a period of home detention.

coronavirus danger —constitute "extraordinary and compelling reasons." And because the § 3553(a) factors weigh in favor of release, he moves this Court to reduce his sentence to time served so that he may return home with his family and begin the Court's term of supervised release.

**Factual Background**

On December 9, 2010, Mr. Asher was found guilty on a four count superseding indictment charging distribution, receipt and possession of child pornography.[12]  His criminal conduct was limited to his participation in a peer-to-peer network and pornography found on his computers during a search.[13]  At the sentencing hearing on January 29, 2013, the Court imposed a total sentence of 155 months in prison.[14]  The sentence included a twenty-year term of supervised release.[15]  Mr. Asher has served close to 90% of his custodial sentence.

### A.    Mr. Asher's serious and chronic medical ailments.

Mr. Asher is a 54 year old man who has struggled with early onset Parkinson's disease[16] with speech/swallowing difficulties,[17] heart disease

---

[12] Doc. 53.  One count was dismissed after trial because it merged with a separate count, so he stands convicted of three counts.

[13] PSR ¶¶7-44, Doc. 130, 132.

[14] Doc. 173, 174.

[15] Doc. 173, 174.

[16] See, *Asher, Michael – BOP Medical Records* – 00004, 00007, 000011, 000026, 000029, 000030, 000050, 000053, 000064, 000081; PSR ¶ 61; Doc. 130.

[17] See, *Id*. at 000027.

(cardiomyopathy with an ejection fraction between 40-49%),[18] hypertension[19] and arrhythmia[20] for more than a decade.  He is confined to a wheelchair during waking hours.[21] He also suffers from chronic, constant and severe neck and back pain[22] and migraine headaches,[23] and while not yet diagnosed because Mr. Asher is awaiting a CT scan,[24] the medical records suggest that he could have Ankylosing Spondylitis, an autoimmune disease.[25]

The combination of Parkinson's disease, and cardiovascular disease (including both Cardiomyopathy and Arrhythmia) in a wheelchair-bound patient is not at all surprising: "people living with Parkinson's disease are twice as likely as the general population to develop cardiovascular disease, and they have a 50% greater chance of dying from it."   Moreover, recent research shows

---

[18] See, *Id*. at 000001, 00004, 000011, 000064, 000081

[19] See, *Id*. at 000001, 000047

[20] See, *Id*.  at 000001; PSR ¶¶ 62 (Mr. Asher was "diagnosed with a heart arrhythmia in 2005 by Dr. Azizul Hoque, a cardiologist in Conyers".); Doc. 130 at 28.

[21] See, *Id*. at 000001, 000007, 000026, 000033, 000073, 000080.

[22] See, *Asher, Michael – BOP Medical Records* – 000001, 000004, 000011, 000017, 000022, 000026, 000030, 000032, 000033, 000064, 000076, 000081.

[23] See, *Id*. at 000004, 000011, 000026, 000030, 000032, 000033, 000034, 000064, 000080, 000081, 000082.
[24] The records show that Mr. Asher began to ask that the scan be rescheduled as of December 6, 2019. See, *Id.* at 000039.

[25] See, *Id*. at 000045, 000046.  While requiring a CT scan to make the diagnosis, the records suggest that he may not have Ankylosing Spondylitis because HLA-B27, ESR and CRP were negative, but those tests are suggestive, not conclusive.

that people with Parkinson's related walking problems tend to have more cardiovascular disease, even in the early stages of Parkinson's. [26]  This is true of Mr. Asher, as born out by his BOP medical records.  But Parkinson's Disease presents with another major physical infirmity that almost always goes unnoticed unless specifically tested – the inability to reflexively cough productively, which goes hand in hand with swallowing disorders in Parkinson's.[27]  Indeed, it is this impaired cough reflex that the authors opine contributes to the chronic chest infections and pneumonia, which is the leading cause of death in Parkinson's patients.[28]  This feature of Parkinson's disease would greatly compromise Mr. Asher's ability to keep his airways clear if infected, making it much more likely that his lungs would be compromised by the hallmark pneumonia that has proven to be the lethal complication of Covid-19.[29]

---

[26] *Id.*

[27] See, Attachment B, Giovanni A. Fontana, Tito Pantaleo, Federico Lavorini, Francesco Benvenuti, and Salvatore Gangemi, *Defective Motor Control of Coughing in Parkinson's Disease,* available at https://www.atsjournals.org/doi/pdf/10.1164/ajrccm.158.2.9705094)(last accessed May 27, 2020).

[28] *Id.*

[29] *Expert Alert: When you can't cough — extra COVID-19 precautions for people with physical disabilities,* available at https://newsnetwork.mayoclinic.org/discussion/expert-alert-when-you-cant-cough-%E2%80%95-extra-covid-19-precautions-for-people-with-physical-disabilities/ (last visited May 27, 2020); See also *Breathing & Respiratory Difficulties*, available at https://www.parkinson.org/Understanding-Parkinsons/Symptoms/Non-Movement-Symptoms/Breathing-and-Respiratory-Difficulties (last visited May 27, 2020) (noting that Parkinson's disease

BOP should have filed this motion on Mr. Asher's behalf.  Mr. Asher is
"suffering from a serious physical or medical condition ... that substantially
diminishes the ability of the defendant to provide self-care within the
environment of a correctional facility and from which he ... is not expected to
recover." See U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).  Mr. Asher's health issues and
confinement to a wheelchair for more than 50% of his waking hours alone justify
compassionate release under U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I) and BOP
guidelines.[30]  BOP's policy statement 5050.50 provides:.

> 3. REQUESTS BASED ON MEDICAL CIRCUMSTANCES
>
> The criteria for a reduction in sentence (RIS) request may include the
> following:
>  . . .
>
> b. Debilitated Medical Condition.  RIS consideration may also be
> given to inmates who have an incurable, progressive illness. . . .
>
> BOP should consider a RIS if the inmate is:
> . . .
>
> ▪ Completely disabled, meaning the inmate cannot carry on any
> self-care and is totally confined to a bed or chair; or

medications and swallowing issues and cause breathing problems in Parkinson's
patients).

[30] See, Attachment C, BOP Policy Statement 5050.50 at 5.  Mr. Asher's
compassionate release request (Attachment D) and appeal (Attachment E) have
been both been denied by the warden in what appears to be a form letter, simply
because he was convicted of a non-contact child pornography offense and is 54
years old, with no personalized assessment of danger to the community. The
personalized assessment of Mr. Asher's lack of dangerousness called for by §
3553(a) will be addressed later in this Motion.

▪ Capable of only limited self-care and is confined to a bed or chair more than 50% of waking hours.

In addition to falling squarely within the guideline provision and BOP's policy statement, Mr. Asher's disability combined with heart disease, high blood pressure, arrhythmia and Parkinson's Disease are extremely problematic co-morbidities that make him both especially susceptible to the virus and more likely to have deleterious effects from it. "Patients with underlying health conditions and risk factors . . . might be at higher risk for severe disease or death from COVID-19."[31]  The most vulnerable of us are in far worse shape than the rest of us: "Approximately 90 percent of the 1,482 hospitalized patients . . . had one or more underlying medical conditions."[32]  These diseases have been identified by studies as diseases that increase a person's susceptibility to Covid-19 and greatly decrease his survival rate.[33]

---

[31] *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions Among Patients with Coronavirus Disease 2019 − United States, February 12–March 28, 2020*, CDC (March 31, 2020), available at https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm#T1_down (last visited May 27, 2020). Counsel has attached this study here. (Attachment F at 2).

[32] *Id.*

[33] Zantou Wu & Jennifer M. McGoogan, Characteristics of and Important Lessons From the Coronavirus Disease 2019 (COVID-19) Outbreak in China: Summary of a Report of 72 314 Cases From the Chinese Center for Disease Control and Prevention, , JAMA (Feb.24, 2020) available at https://jamanetwork.com/journals/jama/fullarticle/2762130 (last accessed May 27, 2020). ("CFR [case fatality rate] was elevated among those with preexisting comorbid conditions—10.5% for cardiovascular disease, … 6.0% for hypertension".); *Preliminary Estimates of the Prevalence of Selected Underlying Health Conditions* supra at Table 1. (Attachment F at 3).

Mr. Asher's documented heart conditions predict his susceptibility to Covis-19. The Centers for Disease Control and Prevention explains that "[s]erious heart conditions, including heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension, may put people at higher risk for severe illness from COVID-19," because "COVID-19, like other viral illnesses such as the flu, can damage the respiratory system and make it harder for your heart to work. For people with heart failure and other serious heart conditions this can lead to a worsening of COVID-19 symptoms."[34]

His age is yet another contributing factor to the increased risk he faces from COVID-19. A recent study based on data "from individuals who tested positive for COVID-19 in 38 countries ... found that risk of death from the disease rose with each decade of age."[35] In New York State, approximately 10% of fatalities occurred in people between the ages of 50 to 59, almost a threefold increase in fatalities from individuals in the next lower age group of people between the ages of 40 to 49.[36]

---

[34] *Groups at High Risk for Severe Illness*, CDC ONLINE (March 22, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 22, 2020).

[35] Erin Schumaker, Risk for severe COVID-19 increases with each decade of age, abcNEWS (Apr. 1, 2020), https://abcnews.go.com/Health/risk-severe-covid-19-increases-decade-age/story?id=69914642 (citing Robert Verity et al., Estimates of the severity of coronavirus disease 2019: a model-based analysis, Lancet Infectious Diseases (Mar. 30, 2020), https://doi.org/10.1016/S1473-3099(20)30243-7).

[36] COVID-19 Tracker, New York State Department of Health (accessed May 4, 2020), https://covid19tracker.health.ny.gov/views/NYS-COVID19-

And, the very fact that Mr. Asher is in a wheelchair puts him at increased risk to catch the deadly virus.[37]  The Veteran's Administration has warned wheelchair users that they are more vulnerable to infection because just by pushing the wheels of a manual wheelchair, they are constantly coming into contact with surfaces that might contain the virus and the equipment should be washed down repeatedly.



Wheelchair users sit lower and are more vulnerable to infected saliva droplets and aerosols.

---

Tracker/NYSDOHCOVID-19Tracker-Fatalities?% 3Aembed=yes&% 3Atoolbar=no&% 3Atabs=n.

[37] *People with Disabilities, available at*  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last accessed May 22, 2020)

And, people in wheelchairs sit lower than other people stand, and are thus more vulnerable to infected saliva droplets and aerosols spread by talking, laughing, coughing or sneezing.[38]

On May 1, 2020, the National Health Services ("NHS") England published a retrospective review of data gathered from 16,000 hospitalized Covid-19 patients.[39]



---

[38] *Id.*

[39] *Features of 16,749 hospitalised UK patients with COVID-19 using the ISARIC WHO Clinical Characterisation Protocol* , pub. May 1, https://www.medrxiv.org/content/10.1101/2020.04.23.20076042v1.full.pdf (last accessed on May 26, 2020).

And while any of Mr. Asher's medical ailments alone - Parkinson's, Cardiovacular disease, hypertension or arrhythmia - increase his susceptibility to COVID-19 as well as predicting a much, much worse outcome – he also is at greater risk because of the fact that he is wheelchair bound and must rely on other inmates for physical assistance. [40] All of these things together are extremely dangerous when heading into the Covid-19 storm. The experts say, then, that Mr. Asher is profoundly vulnerable to contracting the Covid-19 disease and, once he catches it, he is far more likely than others to die. Many Courts have found Mr. Asher's health issues, alone or in combination with other illnesses, when measured against the Covid-19 threat, justify compassionate release.[41]

---

[40] *People with Disabilities, available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-disabilities.html (last accessed May 22, 2020).

[41] *See United States v. Walls*, 2020 WL 1952979 (E.D. Mich. April 23, 2020) (Defendant suffering from several serious health conditions, including Parkinson's, cardiovascular issues, and loss of ambulatory functions); *United States v. Scholler*, 2020 WL 2512416 (N.D. Cal. May 15, 2020); *United States v. Raia*, 18-cr-657 (D.N.J. May 7, 2020) (doc. 91) (recently diagnosed Parkinson's Disease); *United States v. Ben-Yhwh*, CR 15-00830 LEK, 2020 WL 1874125 (D. Haw. Apr. 13, 2020) (defendant with high blood pressure, psychiatric conditions, Parkinson's disease, among other conditions); *United States v. Handy*, 3:10-cr-00128-RNC-8, 2020 WL 2487371 (D. Conn. May 14, 2020) (heart disease, hypertension and obesity); *United States v. Ebbers,* 2020 WL 92399 (S.D.N.Y. Jan. 8, 2020) (cardiomyopathy, diabetes, altered mental state); *United States v. Mattingly*, 6:15-cr-00005-NKM-JCH, 2020 WL 2499707 (W.D. Va. May 14, 2020) (wheelchair bound, with diabetes and hypertension); *United States v. Lopez*, 1:18-cr-02846-MV-1, 2020 WL 2489746 (D. N.M. May 14, 2020) (hypertension and Type II diabetes); *United States v. Gutman*, 1:19-cr-00069-RDB-2, 2020 WL 2467435 (D. Md. May 13, 2020) (56 year old with MS and hypertension); *United States v. Sedge*, 1:16-cr-

00537-KAM, 2020 WL 2475071 (E.D. N.Y. May 13, 2020) (hypertension, hyperlipidemia, and coronary artery disease); *United States v. Barber*, 6:18-cr-00446-AA, 2020 WL 2404679 (D. Or. May 12, 2020) (hypertension, obesity and diabetes); *United States v. Rivernider*, 3:10-cr-00222-RNC, 2020 WL 2393959 (D. Conn. May 12, 2020) (diabetes, heart disease and hypertension); *United States v. Ramirez*, 1:17-cr-10328-WGY, 2020 WL 2404858 (D. Mass. May 12, 2020) (57 year old man with hypertension, diabetes, and high cholesterol); *United States v. Ullings*, 1:10-cr-00406-MLB-1, 2020 WL 2394096 (N.D. Ga. May 12, 2020) (hypertension and obesity); *United States v. Valencia*, 1:15-cr-00163-AT-1, 2020 WL 2319323 (S.D. N.Y. May 11, 2020) (heart disease, hypertension, epileptic seizures, anxiety); *United States v. Foreman*, 3:19-cr-00062-VAB-1, 2020 WL 2315908 (D. Conn. May 11, 2020) (hypertension); *United States v. Reddy*, 2:13-cr-20358-MFL-LJM-1, 2020 WL 2320093 (E.D. Mich. May 11, 2020) (hypertension, Type II diabetes and orthopedic pain); *United States v. Pena*, 1:15-cr-00551-AJN-1, 2020 WL 2301199 (S.D. N.Y. May 8, 2020) (hypertension); *United States v. Connell*, 18-cr-00281-RS-1, 2020 WL 2315858 (N.D. Cal. May 8, 2020) (hypertension, high cholesterol and pre-diabetes); *United States v. Vo*, 15-CR-00310-BLF-2, 2020 WL 2300101 (N.D. Cal. May 7, 2020) (age, hyperlipidemia, hypertension); *United States v. Quintero*, 6:08-cr-06007-DGL-1, 2020 WL 2175171 (W.D. N.Y. May 6, 2020) (immune suppression, obesity, diabetes and hypertension); *United States v. Reid*, 3:17-cr-001750-CRB-2, 2020 WL 2128855 (N.D. Cal. May 5, 2020) (Valley Fever, prone to heart disease, because hypertension and high cholesterol); *United States v. Pabon*, 2:17-cr-00165-AB-1, 2020 WL 2112265 (E.D. Penn. May 4, 2020) (54 year old man with diabetes, hypertension, hemophilia, atopic dermatitis, gastroesophageal reflux disease, peptic ulcer, and diverticulitis.); *United States v. Guzman Soto*, 1:18-cr-10086-IT-1, 2020 WL 2104787 (D. Mass. May 1, 2020) (age (54), hypertension and diabetes); *United States v. Etzel*, 6:17-CR-00001-AA, 2020 WL 2096423 (D. Or. May 1, 2020) (hypertension, hepatitis C, coronary and cardiac issues); ; *United States v. Lacy*, 3:15-cr-30038-SEM-TSH-1, 2020 WL 2093363 (C.D. Ill. May 1,2020) (hypertension, diabetes, obesity); *United States v. Ardila*, 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May1,2020) (age, diabetes, cardiovascular disease, hypertension, asthma and obesity); *United States v. Pinkerton*, 15-CR-30045-3, 2020WL2083968 (C.D. Ill. Apr. 30, 2020) (diabetes, hypertension, avascular necrosis); *United States v. Brown*, 4:05-cr-00227-RP-CFB-1, 2020 WL 2091802 (S.D. Iowa Apr. 29, 2020) (hypertension, migraines, low white blood cell count, sleep apnea, nasal obstruction); *United States v. Bertrand*, 3:00-cr-00012-LC-1, 2020 WL 2179387 (N.D. Fla.Apr. 29,2020) (prostrate cancer survivor, previous pulmonary embolism, diabetes, chronic kidney disease, asthma and hypertension); *United States v. Musumeci*, 1:07-cr-00402-

RMB-1, Dkt. No. 58 (S.D. N.Y. Apr. 28,2020); *United States v. Handy*, PJM 04-0559, 2020 WL 2041666 (D. Md. Apr. 28, 2020) (lupus, hypertension, asthma, arthropathy, Reynaud's syndrome, and anemia); *United States v. Harper*, 7:18-cr-00025-EKD-JCH-1, 2020 WL 2046381 (W.D.Va. Apr. 28, 2020) (left ventricular hypertrophy, COPD, asthma, hypertension, emphysema, and sleep apnea); *United States v. Robinson*, 3:18-cr-00597-RS-1, 2020 WL 1982872 (N.D. Cal. Apr. 27, 2020) (hypertension and psoriasis); *United States v. Sanchez*, 1:95-cr-00421-MGC-1,Dkt. No.290 (S.D. Fla. Apr. 27, 2020) (hypertension); *United States v. Dillard*, 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr.27, 2020) (hypertension); *United States v. Williams*, 3:17-CR-121-(VAB)-1, 2020 WL 1974372 (D. Conn. Apr. 24, 2020) (asthma, hypertension, ADHD, kidney issues, bypass surgery and high cholesterol); *United States v. Coles*, 2:00-cr-20051-SEM-TSH-1, 2020 WL 1976296 (C.D. Ill. Apr. 24, 2020) (48 year old hypertension and prostate issues); *United States v. Jackson*, 4:14-CR-00576, 2020 WL 1955402 (S.D.Tex. Apr.23, 2020) (kidney disease, hypertension, heart disease and lung disease); *United States v. Logan*, 1:12-cr-00307-LEK-1,Dkt. No. 179 (N.D.N.Y. Apr. 22, 2020) (hypertension); *United States v. Bess*, 16-CR-156,2020 WL 1940809 (W.D.N.Y. Apr. 22, 2020) (heart disease with limited heart function); *United States v .Curtis*, 1:03-cr-00533-BAH-1, 2020 WL 1935543 (D. D.C. Apr. 22, 2020) (wheelchair bound, hypertension, reflux, IBS and glaucoma); *United States v. Scparta*, 1:18-cr-00578-AJN-1, 2020 WL 1910481 (S.D.N.Y. Apr. 20, 2020) (hypertension); *United States v. Joling*, 6:15-cr-00113-AA-1, 2020 WL 1903280 (D. Or. Apr.17, 2020) (hypertension, atherosclerosis, a history of transient ischemic attacks, dyslipidemia, obesity, history of prostate cancer); *United States v. Gileno*, 3:19-cr-161-(VAB);-1, 2020 WL 1904666 (D.Conn. Apr. 17,2020) (asthma); *United States v. Hammond*, 1:02-cr-00294-BAH-1, 2020 WL 1891980 (D.D.C. Apr. 16, 2020) (age and prostate cancer); *United States v. Samy*, 2:16-cr-20610-AJT-DRG-1, 2020 WL 1888842 (E.D.Mich. Apr. 16, 2020) (hypertension, heart failure, diabetes and asthma); *United States v. Sawicz*, 1:08-cr-00287-ARR-1, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (hypertension); *United States v. Burrill*, 17-CR-00491-RS-2, 2e (N.D. Cal. Apr. 10, 2020) (hypertension); *United States v. Miller*, 2:16-cr-20222-AJT-RSW-1, 2020 WL 1814084 (E.D.Mich. Apr. 9, 2020) (heart disease, hypertension, COPD, Hepititis C, pulmonary disease, cirrhosis of the liver); *United States v. Hansen*, 1:07-cr-00520-KAM-2, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020) (heart disease, hypertension, hyperlipidemia); *United States v. Gross*, 1:15-cr-00769-AJN-3, 2020 WL 1673244 (S.D. N.Y. Apr. 6, 2020) (hypertension, sleep apnea and obesity); *United States v. Zukerman*, 1:16-cr-00194-AT-1, 2020 WL 1659880 (S.D.N.Y. Apr. 3, 2020) (age, diabetes, hypertension and obesity); *United States v. Ghorbani*, 18-cr-255-PLF (D.D.C. Apr. 3, 2020) (hypertension); *United States v. Colvin*, 3:19-cr-00179-JBA-1,

### B. Like a tsunami, the Covid-19 pandemic has surged through the Bureau of Prisons.

The most dangerous pandemic in generations has blanketed the globe.[42]  A highly contagious and deadly virus called coronavirus has swept the globe.  On March 11, 2020, the World Health Organization officially labeled the Covid-19 disease a pandemic.[43]  The WHO estimates that one in five people who do contract it require hospitalization.[44]  As of May 28, 2020, the coronavirus has infected at least 5,596,550 people worldwide, leading to at least 353,373 deaths.[45]  For weeks now, the United States has led the world in confirmed cases of Covid-

---

2020 WL 1613943 (D. Conn. Apr. 2, 2020) (hypertension and diabetes); *United States v. Rodriguez*, 2:03-cr-00271-AB-1, 2020 WL1627331 (E.D.Penn. Apr. 1, 2020) (hypertension, diabetes and liver abnormalities); *United States v. Muniz*, 4:09-cr-00199-1, 2020 WL 1540325 (S.D.Tex. Mar. 31, 2020) (hypertension, diabetes and renal disease); *United States v. Harpine*, 6:91-cr-60156-MC-1, Dkt.No. 221 (D.Or. Mar.27, 2020) (hypertension).

[42] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, NEW YORK TIMES (March 17, 2020), available at https://www.nytimes.com/2020/03/17/opinion/coronavirus-1918-spanish-flu.html (last visited April 9, 2020) (noting comparison between current Covid-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[43] World Health Organization, *WHO Characterizes COVID-19 as a Pandemic*, (March 11, 2020), available at https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-COVID-19---11-march-2020 (last visited March 27, 2020).

[44] World Health Organization, *Q&A on Coronaviruses (COVID-19), "Should I Worry About COVID-19?,"* available at https://www.who.int/news-room/q-a-detail/q-a-coronaviruses (last visited April 9, 2020).

[45] *Coronavirus (COVID-19)*, WORLD HEALTH ORGANIZATION (April 16, 2020), https://covid19.who.int/ (last visited May 28, 2020).

19.[46]  By today, in the United States, at least 1,707,700 people have been infected

with the virus, and at least 100, 426 people have died because of the virus.[47]  So,

in contrast to what our President said, we are not getting better.  We are dying.

Covid-19 has proven more deadly to Americans than all the wars we have fought

since the start of the Vietnam war.  It has killed more Americans than 50

Hurricane Katrinas.  The virus continues to spread exponentially.

On March 13, 2020, the White House declared a national emergency, under

Section 319 of the Public Health Service Act (42 U.S.C. § 247(d)).[48]  Three days

later, the White House issued guidance recommending that, for the next eight

weeks, no group of ten or more persons should congregate together.[49]  The

President's declaration followed a report by British researchers, in which they

concluded that without drastic intervention to slow the spread of the deadly

---

[46] Donald G. McNeil, Jr., *The U.S. Now Leads the World in Confirmed Coronavirus Cases*, NEW YORK TIMES (March 26, 2020), available at https://www.nytimes.com/2020/03/26/health/usa-coronavirus-cases.html (last visited April 9, 2020).

[47] *Coronavirus in the U.S.: Latest Map and Case Count*, NY TIMES ONLINE, available at https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 28, 2020).

[48] *The White House, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (March 13, 2020), available at https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergencyconcerning-novel-coronavirus-disease-COVID-19-outbreak/ (last visited March 27, 2020).

[49] Sheri Fink, *White House Takes New Line After Dire Report on Death Toll*, NEW YORK TIMES ONLINE (March 17, 2020), available at https://www.nytimes.com/2020/03/16/us/coronavirus-fatality-rate-white-house.html (last visited March 27, 2020).

illness, 2.2 million Americans may die.[50]  Our own governor, Brian Kemp, also declared a state of emergency here in Georgia for the same reason, and imposed his own strict measures, including a shelter-in-place edict for all "medically fragile" Georgians.[51]

The CDC issued its own expert guidelines on the Covid-19 disease. The people most at risk of contracting the disease—and of dying from the disease— are "older adults and people of any age who have serious underlying medical conditions."[52]  Despite political pressure to back away from its dire warnings, the CDC has dug in, processing ever more data to support its conclusions. According to the CDC, the vulnerable populations include people with serious heart conditions, which it defines to include heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension as well as people with neurological disorders, such as Parkinson's disease.  Each of these diseases makes a person vulnerable to Covid-19 in different ways.

While the President and Georgia Governor have both lifted many of these restrictions, they each still recognize that medically fragile people must continue to socially distance and take extreme precautions especially as the economy

---

[50] *Id.*

[51] *Kemp Declares Public Health State of Emergency* (March 16, 2020), available at https://gov.georgia.gov/press-releases/2020-03-16/kemp-declares-public-health-state-emergency (last visited March 27, 2020).

[52] *Groups at High Risk for Severe Illness*, CDC ONLINE (March 22, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited May 22, 2020).

reopens.[53]  And Georgia Tech's modeling predicts a huge jump in Covid-19 cases – and deaths – in August.[54] From May 26's Georgia count of 1,871 deaths, to a predicted range of 61,000 to 17,900 deaths.  The Georgia Tech model predicts[55] that the demand for hospital beds would greatly exceed the capacity available in most regions in the state.



[53] https://www.11alive.com/article/news/health/coronavirus/coronavirus-news-in-georgia-may-22/85-76a2b9a3-d8b8-4282-a6ae-c56d02768634 (last accessed May 22, 2020); https://blogs.edweek.org/edweek/campaign-k-12/2020/05/trump-pushes-schools-reopen-older-teachers-children-strong.html (last accessed May 22, 2020).

[54] *Georgia Tech model predicts jump in COVID cases, deaths in state by mid-August*, https://www.gwinnettdailypost.com/local/georgia-tech-model-predicts-jump-in-covid-cases-deaths-in-state-by-mid-august/article_8417664a-9181-11ea-b757-7734393459dd.html (last accessed May 22, 2020).

[55] Progression of COVID-19 infections in Georgia, as simulated by researchers at Georgia Tech. Shown are new daily infections for three scenarios. The simulations begin on 18 February with increasing voluntary quarantining by infected individuals and households, followed by school closures on 16 March, sheltering in place beginning 3 April, and then different levels of voluntary quarantine. The actual rate of new infections (red line) is multiplied by 8 to reflect underreporting. Other simulations (not shown) varied the shelter-in-place duration. (Adapted from P. Keskinocak et al., medRxiv preprint, doi:10.1101/2020.04.29.20084764.)

### C.    How does the Covid-19 virus affect prisoners and staff members in the federal prison system?

The federal prisons, says one federal judge, are "tinderboxes for infectious diseases."[56] Another sounded the alarm this way: "[T]he Covid-19 pandemic presents an extraordinary and unprecedented threat to incarcerated individuals" and "each day, perhaps each hour, that elapses threatens incarcerated defendants with greater peril."[57]  Even without widespread testing, demographics reveal that U.S. prisons and jails are Covid-19 "hot spots."[58] The outlook grows more alarming by the day, all while Mr. Asher remains in harm's way.  If Mr. Asher would be more vulnerable than most of us in the safety of his own home (and he is), then what is the danger inside a federal prison?

The CDC, the White House, and the Governor have all urged vulnerable people to take immediate, preventive actions, including avoiding groups of people, washing hands frequently with soap, and staying home, separated from

---

[56] *United States v. Rodriguez*, No. 2:03-CR-271-AB, Doc. 135 at 2 (E.D. Pa. Apr. 1, 2020).

[57] *United States v. Scparta*, No. 1:18-CR-578-AJN-1, Doc. 69 at 18 (S.D.N.Y. Apr. 19, 2020).

[58] See Juatin Carrisimo, *CDC Report Details Extent of Coronavirus Outbreaks in U.S. Jails and Prisons*, CBS News (May 6, 2020), available at https://www.cbsnews.com/news/coronavirus-outbreaks-jails-prisons-cdc-report-covid-19/ (last accessed May 27, 2020) ("Jails and prisons, where social distancing is nearly impossible, have emerged as hotspots for COVID-19"); C.J. Ciaramella, 8 *of the Top 10 Biggest U.S. Coronavirus Hotspots Are Prisons and Jails*, Reason (April 29, 2020), available at https://reason.com/2020/04/29/8-of-the-top-10-biggest-u-s-coronavirus-hotspots-are-prisons-and-jails/ (last accessed May 27, 2020) (analyzing NYTimes data).

other people.[59]  This is a hopeless set of guidelines for federal prisoners, who lack

any ability to protect themselves in these urgent ways.  People in prisons and

jails are uniquely vulnerable to the Covid-19 virus. According to Dr. Jaimie

Meyer, an infectious disease expert and professor at the Yale School of Medicine,

inmates are particularly vulnerable because "[t]he risk posed by infectious

diseases in jails and prisons is significantly higher than in the community, both

in terms of risk of transmission, exposure, and harm to individuals who become

infected."[60]  In her declaration, attached to this motion, Dr. Jaimie Meyer

describes the inadequate pandemic preparedness plans in many detention

facilities and the difficulty of separating infected or symptomatic inmates from

others.  In short, the coronavirus is highly transmissible, extraordinarily

dangerous, and poses a severe threat to even healthy federal inmates.

   The conditions of incarceration foster, rather than limit, the spread of the

virus.  Conditions of confinement allow the contagious disease to thrive. Inmates

arrive at BOP facilities from all over the country, and people who work in the

facilities leave and return daily. Public health experts believe that incarcerated

individuals "are at special risk of infection, given their living situations," and

"may also be less able to participate in proactive measures to keep themselves

safe;" "infection control is challenging in these settings."[61]  The social distancing

---

[59] *People Who Are at Higher Risk for Severe Illness*, CDC ONLINE, *supra* at 7 n.21.

[60] Attachment G at 2 (declaration of Dr. Jaimie Meyer) (used with permission of
the author).

[61] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-
President Mike Pence, and Other Federal, State, and Local Leaders from Public
Health and Legal Experts in the United States" (March 2, 2020), available at

that experts advocate as essential to limiting the spread of Covid-19 is impossible in jail and prison facilities.  Crowding, inadequate ventilation, and security issues all contribute to the spread of infectious disease.[62]

Based on the particularly infectious nature of the virus, the CDC and state governments have advised individuals to practice social distancing and good hygiene.  But social distancing can be difficult for individuals living or working in a prison.[63]  Indeed, conditions of imprisonment create the ideal environment for the transmission of infectious diseases.  As the CDC has noted, "[i]ncarcerated/ detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced."[64]  The CDC thus recognizes the herculean challenge of keeping prison facilities insulated from COVID-19:

> There are many opportunities for COVID-19 to be introduced into a correctional or detention facility, including daily staff ingress and egress; transfer of incarcerated/detained persons between facilities and systems, to court appearances, and to outside medical visits;

https://law.yale.edu/sites/default/files/area/center/ghjp/documents/final_COVID-19_letter_from_public_health_and_legal_experts.pdf (last visited March 27, 2020).

[62] Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators'*, NPR (March 13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jails-worryabout-becoming-coronavirus-incubators (last visited March 27, 2020).

[63] *See* New England Journal of Medicine, *Flattening the Curve for Incarcerated Population — Covid-19 in Jails and Prisons* (Apr. 9, 2020).

[64] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020).

and visits from family, legal representatives, and other community members. Some settings, particularly jails and detention centers, have high turnover, admitting new entrants daily who may have been exposed to COVID-19 in the surrounding community or other regions.

*Id.* Limited space and overpopulation, inadequate ventilation, and lack of resources all contribute to the spread of infectious disease in jails and prisons.

As recognized by our own Judge Brown in a recent grant of compassionate release:

> So "[e]ven *without* a highly contagious pandemic, there is always an unfortunate risk that detainees will be exposed to certain communicable diseases." *Matos [v. Lopez Vega,* __ F. Supp. 3rd __, No. 20-CV-60784-RAR,] 2020 WL 2298775, at *10 [(S.D. Fla. May 6, 2020)]. Detained populations also tend to be in poorer health and suffer from a higher prevalence of infectious and chronic diseases than the general population. *See Fraihat v. U.S. Immigration and Customs Enforcement*, _ F. Supp. 3d _ , No. EDCV 19-1546 JGB (SHKx), 2020 WL 1932570, at *5–6 (C.D. Cal. Apr. 20, 2020) (discussing CDC Interim Guidance and granting preliminary injunction to inmate defendants in the light of COVID-19). And to make matters worse, medical care of prisoners is often limited at the best of times. *See* U.S. Dep't of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (Mar. 2016) (finding BOP experienced chronic medical staff shortages, leading to problems meeting the medical needs of prisoners, requiring the use of outside hospitals, and endangering the safety and security of institutions).[65]

*United States v. Ullings,* __ F.3d __, 2020 WL 2394096, at *1 (N.D.Ga. May 12, 2020).

---

[65] Citing Office of the Inspector General Report, Review of the Federal Bureau of Prisons' Medical Staffing Challenges, March 2016, available at https://oig.justice.gov/reports/2016/e1602.pdf (last accessed May 26, 2020).

The federal prison system simply is not, in spite of its best efforts, capable of preventing a harrowing outbreak. "[T]he agency is in chaos."[66]

The disease has over-run the BOP.  As of May 26, the BOP has reported at least 4,700 inmates and more than 589 staff members, at 81 federal facilities, have tested positive for the coronavirus; no fewer than 59 inmates have died of the Covid-19 disease.[67] The following chart illustrates the virus's ferocious ascent within federal prison walls:[68]

---

[66] Cassidy McDonald, *Federal prison workers say conflicting orders on coronavirus response is putting lives at risk*, CBS NEWS ONLINE (March 19, 2020), available at https://www.cbsnews.com/news/coronavirus-prison-federal-employees-say-conflicting-orders-putting-lives-at-risk-2020-03-19/ (last visited March 23, 2020).

[67] *COVID-19 Cases*, BOP ONLINE, available at https://www.bop.gov/coronavirus/ (last visited May 26, 2020).

[68] Attachment H (created by Rachel Bass, a paralegal at the Federal Defenders of New York, and used with the express permission of the author). The attachment includes several other charts that illustrate the alarming BOP data; available at https://federaldefendersny.org/assets/uploads/BOP_COVID-19_Charts_and_Graphs.5.26.pdf (last accessed May 27, 2020).



While the lack of testing undermines the fulsomeness of the BOP figures,[69] BOP does not acknowledge any positive cases at FCI Jesup, where Mr. Asher is housed.[70] This Court should not bet Mr. Asher's safety on the suggestion that a lack of reported COVID-19 cases at a facility means that the facility has insulated itself from the virus. This argument is deeply flawed in two respects. First,

---

[69] https://www.nydailynews.com/coronavirus/ny-coronavirus-federal-jails-mdc-mcc-no-new-tests-20200422-ozsitxee4ba2lceexrebwx4n4e-story.html (last visited May 11, 2020).

[70] Besides insufficient testing, other evidence undermining BOP's figures. Indeed, BOP does not acknowledge even one death at USP Atlanta, despite the fact that BOP staff member Robin Grubbs died after being infected, since she tested positive for it post-mortem. https://www.cbsnews.com/news/coronavirus-federal-prisons-confirm-first-staff-death-linked-to-covid-19-robin-grubbs-usp-atlanta/ (last visited May 11, 2020).

testing at BOP facilities has varied widely.  The BOP acknowledges that some facilities are simply not testing for COVID-19.[71]  That means that any facility that self-reports zero cases may simply not be testing for the virus.  *See United States v. Asaro*, 2020 WL 1899221, at *3 (E.D.N.Y. Apr. 17, 2020) (noting that, where there are no reported cases in a facility, "absent more information about how much testing the BOP is conducting, it is possible that undetected cases are present in the facility," and emphasizing that "[t]he virus is spreading" in the state where the federal prison is located).  Second, all of the BOP facilities where people are sick, dead, or dying started out with zero reported cases—and the situation turned deadly quickly.  To Mr. Asher's knowledge, FCI-Jesup and its satellite camp have not been testing for COVID-19.

Not only would a failure to test explain FCI and FSL Jesup's lack of positive cases, but it would be consistent with the BOP's modus operandi around the country.  In at least one facility, the BOP has declared all inmates presumptively infected, stopped testing altogether, and refused to release infection estimates.[72]  In another, the president of the correctional officers' union

---

[71] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens (Mar. 31, 2020), https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/; *see also* Cary Aspinwall & Joseph Neff, *These Prisons Are Doing Mass testing for COVID-19—And Finding Mass Infections*, The Marshall Project (Apr. 24, 2020), https://www.themarshallproject.org/2020/04/24/these-prisons-are-doing-mass-testing-for-covid-19-and-finding-mass-infections ("Federal officials have largely given up testing at a half dozen prison").

[72] Nicholas Chrastil, *supra* note 5 ("But the spokesperson said that the BOP would not be releasing the number of presumed positive cases, making it impossible to know how many prisoners at the facility have actually contracted the virus.").

estimates inmate infection at 600% of BOP's public numbers.[73]  One BOP

employee told reporters that "the Bureau is playing with these numbers . . ., if

they don't test 'em and they don't get confirmed they don't have to be

reported."[74]  As an example, only nineteen people out of the combined 2,400

people incarcerated at the Metropolitan Detention Center and Metropolitan

Correctional Center in New York City had been tested as of April 23.[75]  Senators

Dick Durbin (D-IL) and Chuck Grassley (R-IA) have publicly questioned

_____

[73] Staff report, *Elkton union president reports different COVID-19 stats than Federal Bureau of Prisons*, WKBN News, Lisbon Ohio (Apr. 9, 2020), https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-covid-19-stats-than-federal-bureau-of-prisons/ (last asscessed May 28, 2020). At FCI-Elkton, the BOP reported much lower numbers in its official count than those inside the prison. The BOP reported just 10 inmate infections, while the correctional union president said management inside the prison provided strikingly higher numbers: 67 positive or symptomatic and isolated, 44 hospitalized, 14 on ventilators, 12 staff infected, and three dead. *Id.*

[74] Nicholas Chrastil, *Louisiana Federal Prison No Longer Testing Symptomatic Inmates for Coronavirus Due To 'Sustained Transmission,'* The Lens, note 5 (Mar. 31, 2020), https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/; Walter Pavlo, *Bureau of Prisons Underreporting COVID-19 Outbreaks in Prison*, Forbes (Apr. 1, 2020), https://www.forbes.com/sites/walterpavlo/2020/04/01/bureau-of-prisons-underreporting-outbreaks-in-prison/#407f36c37ba3 (quoting BOP spokesperson Sue Allison, who confirmed that the BOP's reporting "does not necessarily account for unconfirmed (non-tested) cases.").

[75] Andrew Cohen, *Federal Prisons Told Inmates They Were Coming Home Because of COVID-19. Then They Took It Back*, Slate (Apr. 28, 2020), https://slate.com/news-and-politics/2020/04/federal-prisons-reverse-covid-19-releases-william-barr.html.

whether the BOP's numbers are accurate and whether the BOP is downplaying the threat of COVID-19 behind bars.[76]

Testing matters. Out of 2,700 tests conducted nationwide by the BOP, nearly 2,000 came back positive—roughly 70%.[77]  If this figure is generalizable to the broader population in the BOP's care, all of those people are in grave danger. We should not feel comforted by a facility reporting zero cases if that facility is not testing any of the people in its care.

Moreover, because of how quickly COVID-19 spreads in a prison environment, facilities with zero cases can become deadly hotspots within a matter of days or weeks.  For example, on April 3, the government opposed a release motion for an inmate in FCI–Butner, citing the BOP's generic COVID-19 policies, such as screening, visitation lockdown, and social distancing. *See United States v. Rumley*, No. 08-cr-5, Dkt. 185, at 4–7 (W.D. Va. Apr. 3, 2020).  On March 24th, Butner reported its first case.  By April 14th, four incarcerated people had died and 45 were confirmed infected.[78]   By May 4, six incarcerated people had

---

[76] Letter from Senators Durbin & Grassley to Inspector General Michael Horowitz (Apr. 21, 2020), https://www.durbin.senate.gov/imo/media/doc/DOJ%20IG%20COVID-19%20BOP%20letter%20final%20signed.pdf.

[77] Michael Balsamo, *Over 70% of tested inmates in federal prisons have COVID-19*, Associated Press (Apr. 29, 2020), https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f.

[78] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (archived copy, Apr. 14, 2020), https://web.archive.org/web/20200415200817/https://www.bop.gov/coronavirus/index.jsp.

died and 210 were confirmed infected.[79]  By May 27, ten incarcerated people died from Covid-19 and at least 370 inmates have been infected.[80]  And, despite the BOP's "precautions," the virus has infected Butner's medical center, which houses extremely medically vulnerable inmates.[81]

FCI-Terminal Island is another example of this troubling phenomenon of rosy prognostications followed by a facility plunging into illness and death.  As of April 13, 2020, that prison reported seven positive cases among its incarcerated population and two positive staff cases.[82]  As of May 4, 2020, those numbers exploded—687 prisoners have tested positive, and nine have died.[83]  Seventeen staff members have tested positive as well.  Similar outbreaks have occurred at federal prisons in Forrest City, Lexington, Elkton, Oakdale, and Fort Worth.[84]

---

[79] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp.

[80] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 27, 2020), https://www.bop.gov/coronavirus/index.jsp.

[81] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 4, 2020), https://www.bop.gov/coronavirus/index.jsp.

[82] *Id.*

[83] *COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 27, 2020), https://www.bop.gov/coronavirus/index.jsp.

[84] *See, e.g.*, Debbie Holmes, *After Six COVID-19 Deaths, Judge Orders Elkton Prison to Transfer At-Risk Inmates*, WOSU Radio (Apr. 22, 2020), https://radio.wosu.org/post/after-six-covid-19-deaths-judge-orders-elkton-prison-transfer-risk-inmates#stream/0 (discussing Elkton); Sadie Gurman, et al., *Coronavirus Puts a Prison Under Siege*, Wall Street Journal, (Apr. 6, 2020), https://www.wsj.com/articles/inside-oakdale-prison-our-sentences-have-turned-into-death-sentences-11586191030 (discussing Oakdale); Scott Gordon,

BOP's own data, although woefully underreported, demonstrates a

percentage of Covid-19 infecting it's incarcerated people at rates hundreds of

times higher than the United States at large, China or Italy, as shown in the

graph below.[85]



---

*COVID-19 Cases Nearly Quadruple Inside Fort Worth Federal Medical Prison*, NBC
DFW (Apr. 23, 2020), https://www.nbcdfw.com/news/coronavirus/covid-19-
cases-quadruple-to-132-at-fort-worth-federal- prison/2356912/ (discussing Fort
Worth); Mitchell McCluskey et al., *A North Carolina prison complex has 60 inmates
and 23 staff members with coronavirus*, CNN (Apr. 12, 2020),
cnn.com/2020/04/12/us/butner-prison-coronavirus-cases/index.html. On
April 24, an outbreak of COVID-19 cases at the Federal Medical Center in
Lexington, Kentucky "led to a sharp increase" in the area's COVID-19 cases,
"when the city had settled into a period of relatively few new cases." Daniel
Desrochers, *Outbreak of COVID-19 reported at Federal Medical Center in Lexington:
33 inmates positive*, Lexington Herald-Leader (May 1, 2020),
https://www.kentucky.com/news/coronavirus/article242449731.html.;
*COVID-19 Coronavirus page*, Federal Bureau of Prisons (May 27, 2020),
https://www.bop.gov/coronavirus/index.jsp.

[85] Attachment H; available at
https://federaldefendersny.org/assets/uploads/BOP_COVID-
19_Charts_and_Graphs.5.26.pdf (last accessed May 27, 2020).

COVID-19 is already in the Jesup and surrounding community despite Georgia's lockdown.  Georgia has now "opened up" and our Covid-19 infection numbers are starting to rise, up 21% over last week.[86]  This means that it is only a matter of time before a guard or other staff carries it into the facility, in the event that has not already happened.

### D.     Jesup Cannot Protect Mr. Asher.

There are approximately 2,000 inmates and 500 staff members.[87] According to FCI Jesup Correctional Officer and the Union President of the American Federation of Government Employees, Bureau of Prisons Local 3981 FCI Jesup, Pamela Milwood, the 500 employees do not have enough personal protective equipment.  "If it comes to Jesup, it will be through the staff, and it will be because they did not provide us the equipment to prevent it," Milwood told WTOC, the local news station.[88]

As part of the BOP's protocols for dealing with the virus, staff members who work in facilities in areas with "sustained community transmission" are having their temperature taken before their shifts start.  If it's too high, they'll be

---

[86] Where U.S. coronavirus cases are on the rise (May 26, 2020), available at https://www.reuters.com/article/us-health-coronavirus-usa-trends-graphic-idUSKBN2321WY (last accessed May 27, 2020).

[87] *Jesup Prison Guards Concerned over COVID-19*, available at https://www.wtoc.com/2020/04/24/jesup-prison-guards-concerned-over-covid-/ (last accessed May 26, 2020).

[88] *Id.*

sent home.  But officers at a medium-security federal prison in Jesup, Georgia, described broken thermometers hampering screenings.  When a staff member got a frighteningly low reading of 89 degrees — an indication of hypothermia — management argued that each person's body temperature is different and refused to replace the thermometers, they said.[89]  Ms. Milwood was interviewed and said staff members who report being sick are still being told to work, their temperatures taken not by medical staff.  "How do you determine that I look sick and you don't? Who makes that call? You have a factory foreman[90] over there taking our temperatures, not even clinical. Who is he to make that call?" she said.[91]

Union President Millwood told ABC News that officers in the facility do not have access to hand sanitizer and were just given masks in April.[92] "The institution is not concerned with our staff being exposed to COVID-19. When staff have reported exposure, the agency's doctor, Sylvie Cohen has directed that

---

[89] *Federal Prisons Struggle to Combat Growing COVID-19 Fears: The federal Bureau of Prisons is struggling to manage the growing coronavirus pandemic as advocates and even prison guards call for major reforms to head off a potential outbreak behind bars (March 27, 2020), available at* https://www.usnews.com/news/health-news/articles/2020-03-27/federal-prisons-struggle-to-combat-growing-covid-19-fears (last accessed May 26, 2020).

[90] FCI Jesup is a Unicor factory facility.

[91] *Id.*

[92] See, *Bureau of Prisons coronavirus response under fire: 'Reactive,' not 'proactive,' inmates, staff say: BOP has more COVID-19 cases than three states,* available at https://abcnews.go.com/Health/bureau-prisons-coronavirus-response-fire-reactive-proactive-inmates/story?id=70063263 (last accesses on May 26, 2020).

so long as staff are not symptomatic they immediately return to work or use their own leave," Milwood told ABC News by e-mail.  "All it will take is one diagnosis and we will be the new Oakdale," Millwood said.[93]

Milwood has also reported that each staff member was given three thin and non-protective cotton masks to wear.  Ms. Milwood showed the camera the paltry masks that had been provided to staff, stating "you can see down there, there's no protection whatsoever."[94]



Jesup prison guards concerned over COVID-19

---

[93] *Id.*

[94] *Jesup Prison Guards Concerned over COVID-19,* available at https://www.wtoc.com/2020/04/24/jesup-prison-guards-concerned-over-covid-/ (last accessed May 26, 2020).

The masks cannot be reused after washing them as washing them destroys them.[95]



"It's only a matter of time before COVID hits Jesup."[96]

Mr. Asher reports that at Jesup, neither the guards nor the inmates are tested.  The guards, who come in daily from the community, do not wear masks or gloves, even when preparing meals. Obviously, that's because the ones issued are not reusable.  Newspaper articles have chronicled the failure of BOP in

---

[95] Photo taken from Ms. Milwood's publicly available Facebook page.

[96] *Jesup Prison Guards Concerned over COVID-19,* available at https://www.wtoc.com/2020/04/24/jesup-prison-guards-concerned-over-covid-/ (last accessed May 26, 2020).

protecting the medically vulnerable throughout the country.  And once the virus floods the prison walls, even the Little Dutch Boy[97] could not tame the tide: Mr. Asher will be swept up in the Covid-19 tsunami.

Mr. Asher is in the low security satellite camp.  The housing at the camp does not consist of individual or two-man cells, but rather dormitory style rooms with four units.  Mr. Asher cohabits in his unit with 60 other inmates.  They share one large room, in which they have been locked down 24 hours per day since the Covid-19 outbreak, except for two five minute walks to pick up meals.  The 60 men share only four sinks, showers and toilets.  Unlike other lows, Jesup units each share a common entrance, T.V. room and ventilation system for all four units.  The physical layout of the camp makes it impossible to socially distance to avoid spreading of the virus.

Moreover, with Mr. Asher's handicap, his personal challenges are much worse.  He must accept the assistance of other inmates and cannot appropriately socially distance himself.  Imagine what the wheels of Mr. Asher's wheelchair touch as he wheels himself around the prison dormitory.   However, with 60 men and four sinks, keeping the wheels clean in such an environment is an impossible task.  So, even if he washes his hands repeatedly, once the virus is at Jesup, if a cough or sneeze drops infected saliva droplets on the floor, it will be on his wheels and then his hands in no time.  A secondary social distancing problem is that he must also rely on other inmates to help him with his food tray and other basic necessities.

---

[97] Dodge, Mary Mapes. *Hans Brinker; or, The Silver Skates: A Story of Life in Holland.* Scribners: 1886, tells the story of the Little Dutch Boy who saved his village by putting his finger in a dike and holding back the flood.

Wayne County has 17 confirmed cases, the last 3 in a week.[98]  On May 18, Georgia Department of Public Health reported 14 confirmed Covid-positive cases in Wayne County, with a population of 30,000 people.  But it is less than an hour's drive to more populated areas and places with a higher infection rate, where staff members likely reside.  For instance, Brunswick and I-95 are about a half hour away from Jesup.   Glynn County has suffered 87 cases and one Covid-19 death as of May 26, 2020.[99]  Appling County is 40 minutes in the other direction and it has suffered 135 cases and 13 deaths.[100]  Pearce County is a 30 minute drive southwest and it has suffered 91 cases and 3 deaths.[101]

The beaches of Tybee Island, Hilton Head, Jacksonville and Panama City are not much farther.  Those beaches were full on Memorial Day weekend. [102]

---

[98] https://dph.georgia.gov/covid-19-daily-status-report.

[99] *Id.*
[100] *Id.*

[101] *Id.*

[102] https://www.wtoc.com/2020/05/24/heavy-traffic-few-incidents-tybee-island-memorial-day-weekend/; https://www.wtoc.com/2020/05/26/hilton-head-leaders-reflect-extremely-busy-memorial-day-weekend/; https://www.wsfa.com/2020/05/25/coronavirus-not-deterring-panama-city-beach-crowds-during-memorial-day-weekend/ (all last accessed May 27, 2020).



## NEWS

# Heavy traffic, but few incidents on Tybee Island Memorial Day weekend

Beach-goers weren't the only ones out and about on Tybee Island, law enforcement was there to keep traffic going smoothly and help keep everyone safe.



Heavy traffic, but few incidents on Tybee Island Memorial Day weekend

By **Lyndsey Gough** | May 24, 2020 at 9:57 PM EDT - Updated Ma 24 at 11:44 PM

TYBEE ISLAND, Ga. (WTOC) - Beach-goers

And photos from the newscasts clearly show that beachgoers were neither social distancing nor wearing masks.





**LOWCOUNTRY NEWS**

## Hilton Head leaders reflect on extremely busy Memorial Day weekend

**NEWS**

## Coronavirus not deterring Panama City Beach crowds during Memorial Day weekend



Hilton Head leaders reflect on extremely busy Memorial Day weekend



Coronavirus not deterring Panama City Beach crowds during Memorial Day weekend

By Kristen Rary | May 26, 2020 at 4:21 PM EDT - Updated May 26 at 4:48 PM

By Brennan Reh | May 24, 2020 at 4:19 PM CDT - Updated May 25 at 1:21 PM

HILTON HEAD ISLAND, S.C. (WTOC) - The town

PANAMA CITY BEACH, Fla. (WTVM) - Many

No doubt that Ms. Milwood is right – it is just a matter of time before Jesup becomes swamped by the Covid-19 tsunami.  Mr. Asher, like all federal inmates, sits directly in the path of the viral storm.

### Argument & Citation of Authority

Congress enacted the modern form of the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as part of the Comprehensive Crime Control Act of 1984—it created a mechanism for district courts to reduce a defendant's sentence for "extraordinary and compelling reasons."[103] The law appointed the Director of

---

[103] *See* Comprehensive Crime Control Act of 1984, Pub. L. No. 98–473, ch. II(D) § 3582(c)(1)(A), 98 Stat. 1837 (1984).

the BOP as the lone gatekeeper; only he or she was empowered to file a motion for compassionate release. Even if a defendant qualified for a sentence reduction under the statute, a sentencing court only had authority to reduce a sentence upon motion of the Director.[104] The Director very rarely filed such motions and there was nothing defendants (or courts) could do about it.[105] The law was a mirage, an oasis that often evaporated before the eyes of deserving federal defendants. Then came the First Step Act. The express purpose of Section 603 of the First Step Act, which President Trump signed into law on December 21, 2018, is to "increas[e] the use and transparency of compassionate release."[106] In this statute, Congress, for the first time, enables a defendant (with or without BOP approval) to invoke § 3582(c)(1)(A) and to move the sentencing court for a compassionate-release sentence reduction. A district court may now—with or without the BOP's blessing—resentence a defendant if he files a motion and establishes "extraordinary and compelling reasons" for a sentence reduction.

---

[104] *See, e.g., Orlansky v. FCI Miami Warden*, 754 Fed. Appx. 862, 866 (11th Cir. 2018) ("Congress provided that a federal court may reduce an inmate's sentence only upon a motion by the Director of the BOP").

[105] *See generally* U.S. DEP'T OF JUSTICE OFFICE OF THE INSPECTOR GENERAL, THE FEDERAL BUREAU OF PRISONS' COMPASSIONATE RELEASE PROGRAM (2013) (criticizing the BOP's implementation of the Compassionate Release program and finding it rarely moved courts for compassionate release), *available at* https://oig.justice.gov/reports/2013/e1306.pdf (last visited January 24, 2020).

[106] First Step Act of 2018, Pub. L. No. 115-391, § 603, 132 Stat. 5194 (Dec. 21, 2018).

1.    **Under the new version of § 3582(c)(1)(A), this Court has jurisdiction to grant Mr. Asher compassionate release.**

The BOP still has a role to play in this drama. The law expects a defendant to begin his journey by filing inside the prison an administrative request for compassionate release. The law also prefers that he wait 30 days before filing a formal motion in the sentencing court. The newly-revised statute reads in full:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf *or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier*, may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—(i) extraordinary and compelling reasons warrant such a reduction . . . [107]

Mr. Asher applied for compassionate release within the prison on April 8, 2020 and the warden denied his request on April 17, 2020.[108]  He timely appealed and his appeal was denied on May 11, 2020.[109]  Thus, Mr. Asher has complied with the statute's administrative-remedy requirement.  This Court clearly now has jurisdiction to measure Mr. Asher's compassionate-release motion.

2.    **Mr. Asher demonstrates "extraordinary and compelling reasons" under § 3582(c)(1)(A) for a reduction in sentence.**

The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), provides that a court may reduce a defendant's term of imprisonment after consideration of the factors set forth in § 3553(a) if it finds "extraordinary and compelling

---

[107] 18 U.S.C. § 3582(c)(1)(A).

[108] See, Attachment D.

[109] See, Attachment E.

reasons" and such a reduction is "consistent with the applicable policy statements issued by the Sentencing Commission."  Mr. Asher merits compassionate release in light of his chronic medical conditions in combination with the harrowing threat of the deadly Covid-19 disease.

## A.    What does an "extraordinary and compelling reason" mean?

An "extraordinary and compelling reason" is in the eye of the beholder.  It is a reason that the sentencing court says is substantial enough, and urgent enough, to merit compassionate release. When Congress penned the law 35 years ago, it did not tell us what constitute extraordinary and compelling reasons and instead delegated this task to the United States Sentencing Commission.[110] In response, the Commission produced U.S.S.G. § 1B1.13. An application note to the guideline provides three categories of "extraordinary and compelling reasons" and a fourth catchall provision:

(A)    *Medical Condition of the Defendant.*—

(i)    The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii)    The defendant is— (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process,

---

[110] *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction . . . .").

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)  *Age of the Defendant.*—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)  *Family Circumstances.*— (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children; (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.[111]

After the First Step Act, these guideline are merely suggestions, not rules.  Courts have recently recognized that while the Commission's policy statements provide helpful guidance, they do not constrain a court's independent assessment of whether "extraordinary and compelling reasons" exist to warrant a sentence reduction under § 3582(c)(1)(A).[112]  This point was recently made by Judge Brown:

> Nevertheless, the Court agrees with other courts in holding that section 1B1.13 provides helpful guidance but does not constrain the issues a court may consider in assessing whether a defendant's application for compassionate release provides "extraordinary and compelling reasons" for a sentence reduction under § 3582(c)(1). . . . The Court thus "finds that it is authorized to consider the

---

[111] U.S.S.G. § 1B1.13, comment. n.1.

[112] *See United States v. Beck*, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019). This is so because the Commission's statutory authority is limited to explaining "the appropriate use of [§ 3582] under the current statute." *United States v. Cantu*, 2019 WL 2498923, at *3 (S.D. Tex. June 17, 2019).  An amendment to § 3582, including to the compassionate release section, "may [therefore] cause some provisions of a policy statement to no longer fall under that authority." *Id.*

enumerated circumstances, as well as circumstances other than, or in combination with, the enumerated circumstances. The Court thus considers the § 3553(a) factors, the Sentencing Commission's guidance in section 1B1.13, and the individual situation and circumstances presented by Ms. Ullings's application.

*United States v. Ullings*,[113] at 6-7.  Put another way, a court may now, thanks to the First Step Act, identify—and rely upon—"extraordinary and compelling reasons" that fall outside the Commission's list.

### B.    Mr. Asher merits compassionate release in light of his chronic medical conditions combined with the grave and imminent danger the Covid-19 pandemic poses to him.

The Covid-19 pandemic ought to make the result here obvious.  Mr. Asher's chronic medical conditions and wheelchair use, *in combination with* the Covid-19 pandemic, merit immediate relief.  During this pandemic, Mr. Asher, a 54 year old male with a long-term chronic heart disease, high blood pressure, Parkinson's Disease and arrhythmia, is among the most vulnerable people imaginable.  He falls within several sub-groups of people identified by the CDC and other medical groups as most in danger of contracting the coronavirus and, what's more, of dying from the Covid-19 disease once that catch it.  Mr. Asher would be highly vulnerable to the Covid-19 virus and disease even if he lived in the safety of his own home and community, but that danger is all the more imminent because he is trapped again inside another federal prison.  Mr. Asher stands directly in the path of the deadly disease.  Mr. Asher simply cannot wait any longer.  Under the First Step Act, he now asks this Court to intervene.

---

[113] *United States v. Ullings*, ND.Ga Case Number 1:1-CR-00406-MLB.

### C. Federal courts have found, in a flood of recent orders, that for vulnerable defendants, the COVID-19 pandemic and the concentrated threat it poses to inmates in federal prisons is an extraordinary and compelling reason that merits compassionate release.

Federal judges, including this Court, have begun, like forest firefighters, to snatch prisoners from the virus's fiery path, especially for defendants with underlying, chronic vulnerabilities. "[T]he persuasive precedent for granting compassionate release under the current circumstances is overwhelming."[114] The roster of Covid-19-based compassionate-release orders on all sorts of medical conditions is deep. The string cite would cause any law clerk to throw her laptop across the room, so we have placed it in a separate document attached here.[115] We offer here a handful of quotations, just to give a flavor of the judicial response to the Covid-19 virus in compassionate release motions:

In *United States v. Logan*, the court wrote this: "[P]risons are 'powder kegs for infection' that have therefore allowed the Covid-19 virus to spread with uncommon and frightening speed."[116]

In *United States v. Resnik*, the court declared that "[r]eleasing a prisoner who is for all practical purposes deserving of compassionate release during normal times is all but mandated in the age of Covid-19."[117]

---

[114] *Samy v. United States*, 2020 WL 1888842, at *4 (E.D. Mich. Apr. 16, 2020); *see also United States v. West*, No. 1:17-CR-390-AT-1, Doc. 53 (N.D. Ga Mar. 30, 2020).

[115] Attachment I.

[116] No. 1:12-CR-307-LEK, Doc. 179 at 6 (N.D.N.Y. Apr. 22, 2020).

[117] 2020 WL 1651508, at *7 (S.D.N.Y. Apr. 2, 2020).

In *United States v. Rodriguez*, the court offered this bleak assessment: "Prisons are tinderboxes for infectious disease.  The question whether the government can protect inmates from Covid-19 is being answered every day, as outbreaks appear in new facilities."[118]

In *United States v. Perez*, the court granted compassionate release because "[t]he benefits of keeping [Perez] in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave."[119]

In *United States v. Foster*, the court offered this riff in a case involving a defendant with a chronic lung disease:

> The circumstances faced by our prison system during this highly contagious, potentially fatal global pandemic are unprecedented. It is no stretch to call this environment "extraordinary and compelling," and we well believe that, should we not reduce Defendant's sentence, Defendant has a high likelihood of contracting Covid-19 from which he would "not expected to recover." U.S.S.G. § 1B1.13.  No rationale is more compelling or extraordinary.

> The Defendant has a chronic lung disease that may very well equate a Covid-19 diagnosis with a death sentence. . . . "If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize" Defendant's grim predicament. . . . We therefore find that the unparalleled present global pandemic tips the scales in favor of Defendant's release.[120]

---

[118] No. 2:03-CR-271-AB-1, Doc. 135 at 2 (E.D. Pa. Apr. 1, 2020).

[119] No. 1:17-CR-513-AT, Doc. 98 at 7 (S.D.N.Y. Apr. 1, 2020).

[120] No. 1:14-CR-324-JEJ-02, Doc. 191 at 10-11 (M.D. Pa. Apr. 3, 2020).

In *United States v. Ben-Yhwh*, the court granted compassionate release because "Ben-Yhwh's age, underlying health issues, including Parkinson's and heart disease, and the spread of Covid-19 demonstrate that further delay has a high probability to cause him to suffer catastrophic health consequences, including death."[121]

In *United States v. Tran*: "[W]hile the Court is aware of the measures taken by the BOP, news reports of the virus's spread in detention centers within the United States and beyond our borders demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection."[122]

In *United States v. Zukerman*, the court declared: "The severity of Zukerman's conduct remains unchanged. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to 'include a great and unforeseen risk of severe illness or death' brought on by a global pandemic."[123]

In *United States v. Burrill*, the court granted compassionate release because "[f]ederal correctional institutions, which had reported zero Covid-19 cases only weeks ago, and despite the steps the BOP has taken to contain the disease within its facilities, are now reporting numerous virus-related deaths" and "[t]he Covid-

---

[121] No. 1:15-CR-830-LEK, Doc. 206 at 10-11 (D. Hawaii Apr. 13, 2020).

[122] No. 8:08-CR-197-DOC, Doc. 405 at 4 (C.D. Cal. Apr. 10, 2020).

[123] No. 1:16-CR-194-AT, Doc. 116 at 11 (S.D.N.Y. Apr. 3, 2020).

19 pandemic is extraordinary and unprecedented in modern times in this nation."[124]

### D. The other branches of government—represented by Congress and the Attorney General—have also expressed great anxiety for the well-being of vulnerable federal inmates.

The courts are not the only branch of government rushing to save captive prisoners from the disease.  The Attorney General and Members of Congress have responded to the Covid-19 pandemic by urging the BOP to release more inmates from federal prisons. In the last few weeks, the Attorney General issued memoranda to the Director of the BOP, outlining a new policy by the United States Department of Justice ("DOJ") to deal with confined inmates who are most vulnerable to the Covid-19 virus.[125]  The first memorandum was issued "to ensure that [the BOP] utilize[s] home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody."[126]  The Attorney General has "direct[ed the BOP] to prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic."[127]  One of these statutes, of course, is the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), invoked in

---

[124] No. 3:17-CR-491-RS, Doc. 308 at 6-7 (N.D. Cal. Apr. 10, 2020).

[125] "Memorandum for Director of Bureau of Prisons:  Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic," Office of Attorney General (March 26, 2020), available at https://www.justice.gov/file/1262731/download (last visited March 28, 2020).

[126] *Id.* at 1.

[127] Barr Memorandum at 1.

our motion on behalf of Mr. Asher.  The "list of discretionary factors" cited in the Attorney General's directive, including "age and vulnerability to Covid-19" overwhelmingly support Mr. Asher's immediate release.

The Attorney General is not alone in urging the BOP to act.  In light of the sudden danger to federal prisoners, some Members of Congress have written to the BOP to urge it to accomplish the immediate release of non-violent, elderly inmates through compassionate release motions of its own.[128]  Four hundred former federal judges, prosecutors, and DOJ officials sent an open letter to the White House urging the President to commute sentences in response to the Covid-19 crisis.[129]  These governmental voices urging a prompt response to the

---

[128] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick. Pursuant to 18 U.S.C. 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons."), available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_Covid19.pdf (last visited March 30, 2020).

Senator Kamala Harris also sent a letter to the BOP urging it to release low-risk inmates and arguing that the close quarters prisoners live in—paired with the strict measures the BOP is taking distance inmates from the public—makes them particularly susceptible to the Covid-19 virus. Andrew O'Reilly, *Kamala Harris Wants Low Risk Inmates Released Ami Fears of COVID-19- Spreading in Prisons*, FOX NEWS ONLINE, available at https://www.foxnews.com/politics/kamala-harris-wants-low-risk-inmates-released-amid-fears-of-COVID-19-spreading-in-prisons (last visited March 23, 2020).

[129] *Hundreds of former DOJ officials and federal judges urge Prez Trump to commute sentences and create emergency advisory group to respond to COVID-19 challenges*, SENTENCING LAW AND POLICY BLOG (March 27, 2020), available at https://sentencing.typepad.com/sentencing_law_and_policy/2020/03/hundreds-of-former-doj-officials-and-federal-judges-urge-prez-trump-to-commute-sentences-and-create-.html (last visited March 30, 2020).

pandemic provide evidence that each of us, courts included, must use the tools available to us to accomplish the release of vulnerable inmates.

**3.     A reduced sentence of time served is sufficient but not greater than necessary to meet the 18 U.S.C. § 3553(a) sentencing factors.**

Once again, Mr. Asher's circumstances fit squarely within the definition of "extraordinary and compelling reasons" under 18 U.S.C. § 3582(c)(1)(A), but the Court's work is not finished.  We know the Court *may* reduce Mr. Asher's sentence, if it chooses, but *should* it?  How must the Court measure its discretion here?  According to the compassionate-release statute, it must travel a familiar path — the factors in 18 U.S.C. § 3553(a).

The Court must consider, as always, the nature and circumstances of Mr. Asher's offenses.[130] Mr. Asher recognizes the seriousness of his crimes, but it would be remiss of counsel not to point out that this his was a totally non-contact offense.[131]  While BOP automatically declines to grant compassionate release to anyone who it considers a sex offender (based on the crime of conviction or its more nebulous reasoning), this categorical denial has been eschewed by the courts when making a case-by-case dangerousness assessment.  As a result, many people convicted of non-production child pornography crimes, some  with facts far more egregious than Mr. Asher's, have been granted compassionate release. *See, United States v. Pippin*, No. 16-cr-266, ECF No. 122 (W.D. Wash. May 20, 2020) (granting compassionate release to a 50-year-old child pornography defendant

---

[130] 18 U.S.C. § 3553(a)(1).

[131] PSR ¶¶7-44, Doc. 130, 132.

with "multiple chronic medical conditions" who had 28 months left on an 84 month sentence); *United States v. Nicholas Pagliuca*, 17 Cr. 432 (CS), Dkt. No. 63 (S.D.N.Y. May 18, 2020) (granting 69-year-old child pornography defendant with diabetes and heart issues compassionate release after serving 80 percent of 36-month sentence); *United States v. Kurtz*, 16-cr-20036, ECF No. 40 (D. Kan. May 12, 2020) (granting compassionate release to 73-year-old child pornography defendant hospitalized with COVID-19, who spent 18-20 days on a ventilator, "was non-responsive, non-verbal," and whose "prognosis was poor"); *United States v. Connell*, ---F. Supp. 3d---, 2020 WL 2315858, (N.D. Cal. May 8, 2020) (granting compassionate release to 69-year-old child pornography defendant with numerous chronic conditions serving year-and-a-day sentence); *United States v. Adam Field*, No. 18 Cr. 426 (JPO), Dkt. No. 38 (S.D.N.Y. May 4, 2020)  (granting child pornography defendant with hypertension and "nonphysical health conditions" incarcerated at FCI Danbury compassionate release); *United States v. Fischman*, No. 16-cr-00246-HSG, 2020 WL 2097615 (N.D. Cal. May 1, 2020) (granting compassionate release to 72-year-old convicted of possession of child pornography who had tested positive for COVID-19 and was incarcerated at Terminal Island; had approximately four months left on 70-month sentence); *United States v. Dillard*, Case No. 1:15-cr-170-SAB, Dkt. No. 71 (D. Idaho Apr. 27, 2020) (53-year-old with grievous health problems granted compassionate release after serving approximately half of 87-month sentence for second federal non-production child pornography offense); *United States v. Sawicz*, No. 08-cr-287, 2020 WL 1815851 (E.D.N.Y. Apr. 10, 2020) (releasing child-pornography offender with hypertension).  So while the nature of the crimes are

very serious, Mr. Asher will be monitored while on supervised release.  His behavior while he was on bond before his trial is also evidence of his desire to conform his behavior to supervision and compliance with the law.  Mr. Asher is no danger.

Next, the Court must evaluate the history and characteristics of Mr. Asher himself and consider his post-sentencing rehabilitation.[132]  The PSR in this case shows that Mr. Asher was a first offender with no criminal history prior to the crime of his conviction.  At his sentencing hearing, several people who knew Mr. Asher very well testified about his character and the type of person he is.  That transcript is available to the Court and will not be recounted here, but the Mike Asher described by the witnesses was the same Mike Asher who took it upon himself to help other inmates learn valuable skills and educate themselves.  While at Coleman and at Jesup, Mr. Asher has used his time in custody to help other inmates by tutoring thousands of GED candidates.  He has helped hundreds of inmates get their GED every year while at Coleman and then at Jessup.  He has also taught classes in Creative Writing, Economics, Computer Programming and more.[133]  All this despite his health issues and disabilities.  And in his almost nine and one half years in BOP custody, he has not committed a single disciplinary infraction.[134]

---

[132] 18 U.S.C. § 3553(a)(1); *see Pepper v. United States*, 562 U.S. 476, 493, 504-05 (2011) (holding that post-sentencing information bears directly on the court's duty to impose a reduced sentence that is reasonable).

[133] Attachment A at 000006.

[134] Attachment A at 000001.

What of general and specific deterrence and the need to protect the public?[135]  These were prominent pillars of Mr. Asher's original sentence. This Court, however, has a new history to view in determining what deterrence is appropriate.  Indeed, Mr. Asher's conduct in prison undermines the perceived need for any additional incarceration.[136]  His almost nine and one half years in prison has not only deterred him from committing crimes, has taken advantage of *every* opportunity to help other inmates who want to learn and better themselves.  He stands before this Court a humble and better man.

Mr. Asher is not a danger by any stretch of the imagination.  He was on bond prior to his trial for over a year with no violations, and was only taken into custody at the return of the guilty verdict on December 9, 2010.  Mr. Asher is 54 years old and he has no prior criminal history—both factors that greatly reduce his risk of recidivism and hence any concerns that Mr. Asher could be a danger to the community.[137]

Finally, should the Court grant Mr. Asher's motion, he will still have twenty years supervised release.  The Court can, should it choose, add some

---

[135] 18 U.S.C. § 3553(a)(2).

[136] Attachment A at 000001.

[137] *Report-At-A-Glance: Recidivism & Federal Sentencing Policy, United States Sentencing Commission* (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/backgrounders/RG-recidivism-overview.pdf (noting that "recidivism rates generally increase as offenders' criminal history calculations increase" and "[s]tudies have repeatedly shown older offenders to have a lower risk of reoffending and the Commission's study confirmed this finding").

home confinement and electronic monitoring conditions to that supervised release.

Mr. Asher has a stable and loving home to return to – with his wife and adult children, in a semi-rural area that is appropriate for someone required to be on the sex offender registry.  His wife has a family health insurance plan that will include him and cover his medical needs.

## Conclusion

Federal courts all over the nation have granted compassionate-release motions (and immediate release) to vulnerable inmates imperiled by the Covid-19 epidemic. This Court ought to do the same here. A court's "duty is always to sentence the defendant as he stands before the court on the day of sentencing."[138]

Mr. Asher asks the Court to grant a reduction in sentence to time served, plus the original twenty years on supervised release.

/S/ MILDRED GECKLER DUNN
Mildred Geckler Dunn
Federal Defender Program, Inc.
101 Marietta Street, N.W., Suite 1500
Atlanta, Georgia 30303
(404) 688-7530 Fax (404) 688-0768
Millie_Dunn@fd.org

Attorney for Michael Asher

---

[138] *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000).

**CERTIFICATE OF COMPLIANCE AND SERVICE**

I hereby certify that the foregoing pleading was produced using Book

Antigua 13-point font in accordance with Local Rule 5.1C and that I

electronically filed this pleading with the Clerk of Court using the CM/ECF

system, which will simultaneously deliver a digital copy to opposing counsel: J.

Elizabeth McBath and Jeffrey Aaron Brown, Assistant United States Attorneys,

6th Floor, United States Courthouse, Richard B. Russell Building, 75 Ted Turner

Drive, SW, Atlanta, Georgia, 30303.


/S/ MILDRED GECKLER DUNN
Mildred Geckler Dunn
Federal Defender Program, Inc.

May 28, 2020